Filed 8/11/16

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| THE PEOPLE, | ) | |
| | ) | |
| Plaintiff and Respondent, | ) | |
| | ) | S130659 |
| v. | ) | |
| | ) | |
| CRAIGEN LEWIS ARMSTRONG, | ) | |
| | ) | Los Angeles County |
| Defendant and Appellant. | ) | Super. Ct. No. YA049592 |
| _____ | ) | |

A jury convicted defendant Craigen Lewis Armstrong of numerous crimes stemming from three separate, but interrelated, incidents. Specifically, the jury found defendant guilty of the 2001 first degree murders of Christopher Florence and his two older brothers, Michael Florence and Torry Florence (Pen. Code, § 187, subd. (a)),[1] and it found true the multiple-murder special-circumstance allegations associated with those counts. (§ 190.3, subd. (a)(3).) The jury also found true the special circumstance allegations (1) that Christopher's murder was committed while defendant was an active participant in a criminal street gang and was carried out to further the gang's activities, and (2) that the murders of Michael and Torry were committed by means of discharging a firearm from a motor vehicle. (§ 190.2, subd. (a)(21), (22).) In connection with the three first degree

---

[1]     All further statutory references are to the Penal Code unless otherwise indicated.

murders, the jury also found that defendant intentionally discharged a firearm causing death, for purposes of sentence enhancement pursuant to former section 12022.53, subdivisions (b), (c), and (d).

Defendant was further convicted of the premeditated attempted murders of Christopher's younger brother Brian Florence and Floyd Watson, a friend of the Florence family (§§ 187, subd. (a)/664, subd. (a)), and the jury found true the firearm discharge allegations associated with these crimes. (Former § 12022.53, subds. (b), (c).)

The jury found defendant guilty of five additional counts stemming from an incident involving an attempt to intimidate a former girlfriend, Tyiska Webster, to whom defendant had admitted shooting the murder victims. In connection with that incident, defendant was convicted of torture with the infliction of great bodily injury (§ 205, former § 12022.7), second degree robbery (§ 211), first degree burglary (§§ 459), assault with a semi-automatic firearm (§ 245, subd. (b)), and false imprisonment by violence (§ 236). The jury returned a verdict of guilty on a second count of false imprisonment by violence, this crime involving Webster's three-year-old daughter, C. A. (§ 236).

Defendant later admitted the allegation that he was on bail at the time he committed the crimes. (Former § 12022.1.)

After the penalty phase, the jury returned death verdicts as to all three murders. Defendant moved for new trial and for modification of his sentence to life without the possibility of parole. The trial court denied those motions and sentenced defendant to death.[2] This appeal is automatic. (§ 1259.)

---

[2] In sentencing defendant for the noncapital crimes, the court imposed the midterm of three years for the robbery count consecutive to eight months (one-third the midterm) for the false imprisonment of Webster's daughter, consecutive

*(footnote continued on next page)*

During guilt phase deliberations, the trial court discharged a juror for failing to deliberate. Because the record does not show as a demonstrable reality that the juror was unable to perform her duty, we agree with defendant that the court abused its discretion in removing the juror. We conclude furthermore that the error compels reversal of the judgment in its entirety.

## I. FACTS

### A. Guilt Phase Evidence

#### 1. Prosecution Evidence

##### a. Shooting of Christopher Florence

On the evening of September 27, 2001, 21-year-old Christopher Florence was driving his car to meet a young woman near the area of 104th Street and Crenshaw Boulevard in Inglewood. Attempting to follow directions written on a piece of paper, he mistakenly turned right off of 104th Street onto 10th Avenue, going the wrong way on a one-way street. This portion of 10th Avenue is in an area known as "the Bottoms," which was claimed by the Crenshaw Mafia, a Bloods gang of which defendant was a member. Several shots were fired. Christopher was badly injured and drove a few blocks until he crashed into a median barrier on Crenshaw Boulevard. He died a short time later from a bullet wound to his left side. One bullet was recovered from his body and three others from inside the car.

---

*(footnote continued from previous page)*

to a life term for the torture conviction, and life terms with a 20-year enhancement for each of the two premeditated attempted murder counts. The court ordered sentences on all remaining counts stayed pursuant to section 654.

Tyiska Webster, who was defendant's girlfriend at the time, went to the Bottoms the next morning and heard about the shooting. When she asked defendant about it, he told her he shot at the car because it was traveling the wrong way on a one-way street, which he believed was a maneuver used by members of rival gangs before they commit a drive-by shooting. Defendant pointed out broken glass on the street that he said had come from the shooting.

### b. Shooting of the other Florence brothers

On the morning of September 29, 2001, two days after Christopher's death, Christopher's mother and his three brothers, Brian, Torry, and Michael Florence,[3] drove to the Bottoms, near the area where Christopher had been shot. They saw a number of gang members on 10th Avenue, and Michael pointed his finger at them, gesturing as if he had a gun. Around midnight that night, a number of people had gathered at the Florence home to mourn the death of Christopher, including his three brothers and their friend, Floyd Watson. In the course of conducting his own investigation into the shooting, Michael received a call from a woman identifying herself as "Nicole," who said she had information about Christopher's death and would meet with him. The four men left the house in Michael's Ford Mustang to get something to eat. Michael then drove the group in search of the place where he was scheduled to meet Nicole, in the area of 104th Street and South Van Ness Avenue.

They were driving east on Century, and stopped at the intersection of Century and Doty, when Watson looked through the rear windshield and saw a burgundy Ford Contour behind the Mustang in the lane to the left. Defendant was

---

[3]    To avoid confusion, the Florence brothers will be referred to by their first names.

leaning out the window of the rear passenger side of the Contour, yelling something. Watson told Michael that defendant was yelling at them and Michael began to roll down his window. Defendant pulled out a gun and started shooting as the Contour moved forward, parallel to the Mustang. After several gunshots the Contour pulled away. Michael was shot in the head and Torry was shot in the neck.

Brian jumped into the front seat and steered the Mustang out of the way of traffic. Brian and Watson then waved down passing vehicles and left the scene to call for help. When the police arrived, Michael was in the driver's seat and not speaking or moving. Torry was lying in the street. When asked if he knew who the shooter was, he responded, "CMGs," which the officer understood to mean the Crenshaw Mafia Gangsters. Torry stated that a female named "Randi" was involved in the shooting.

Brian and Watson soon returned to the scene and spoke to police. Brian described the shooter as a light-skinned African-American male in a red sweatshirt, Johnny Blaze brand, and he indicated that the shooter had fired from within a red Ford with three females inside. Based on this description, the officer suspected there might be a connection between the shooting and an assault that had occurred earlier that night at a nearby 7-Eleven store. Defendant had exited a red vehicle outside the 7-Eleven store and approached a man, asking him where he was from. A few minutes later, defendant punched the man in the face. An officer who had had prior contacts with defendant reviewed the store's surveillance videotape and identified defendant as the assailant. At the police station later that night, Brian and Watson identified defendant in a photographic lineup of known gang members.

Also that same night, defendant met Tyiska Webster, got into her car, and directed her to the scene of the second shooting. According to Webster, defendant

5

looked at the Mustang and said, "I did that." He told her that he pulled up next to the car and asked its occupants where they were from and then "let them have it."

Both Torry and Michael died from their gunshot wounds, and a bullet was removed from each of their bodies. No evidence was found in the Mustang that any gunshots had been fired from inside the car.

On October 2, 2001, two days after the second shooting, police officers conducted surveillance of a house occupied by defendant and his brother, Darrin Armstrong. They spotted defendant, dressed entirely in red, riding as a passenger in a red Ford Contour driven by Tenesha Washington, the car's registered owner. Officers stopped the car and arrested defendant. The police later conducted a search of defendant's residence and recovered a red Johnny Blaze sweatshirt from defendant's closet.

Also on the day of defendant's arrest, the police stopped a car being driven by defendant's brother Darrin. After obtaining his consent to search, officers found a loaded nine-millimeter pistol. Ballistics analysis indicated that the bullets recovered from Christopher's car and body and the bullets recovered from the shooting of Michael and Torry all had been fired from this weapon. Earlier, police had determined that the red Ford Contour in which defendant was riding at the time of his arrest had sustained no gunshot damage.

### c. Torture of Tyiska Webster

In May 2002, about seven months after the shootings, defendant's former girlfriend Tyiska Webster was living temporarily in the Beverly Garland Hotel under a witness protection program because of her anticipated testimony in a different case. Webster was seven months pregnant at the time and her three-year-old daughter C. was living there with her. Webster was scheduled to move to a

6

more permanent location, and the police detective who was working with her recently had given her a card that showed the new address.

In the early evening of May 1, 2002, Webster heard a knock on the door. A female voice said, "Housekeeping," and Webster opened the door. When she did, four people rushed into the room, including defendant's brother Darrin, and three others. After Webster had been pushed onto the bed, Darrin questioned her about money she was supposed to send to defendant in jail and asked why she was in the witness protection program and whether she was "snitching" on defendant. Meanwhile, Webster's young daughter had been taken into the bathroom. When Webster denied informing on defendant, Darrin hit her on the head with an unloaded nine-millimeter handgun. He then loaded the gun. The intruders placed a pillowcase over Webster's head and beat her. At one point, Webster heard Darrin answer a telephone call, telling the caller, "We found her" and "What do you want me to do to her." Darrin also said they had not found any money and asked if they should "oop" her, which Webster understood to mean shoot or kill her. He then put the phone next to Webster's ear. The caller, whose voice Webster recognized as defendant's, asked why she had not deposited money into his account. Webster had deposited money for defendant a few times in the past, but had since stopped doing so. Webster told defendant that she would put money in his account if he told Darrin and the others to leave. Darrin took back the phone and continued to talk, then ended the call by saying, "We'll just beat her up some more." The group used a telephone cord to whip and attempt to strangle Webster. They also lit some sticks and used them to burn her approximately 140 times. They left after taking her clothes and the contents of her wallet, ordering her not to tell anyone about the incident and warning her that they knew where her grandmother lived.

7

Detectives interviewed Webster while she was in the hospital being treated for her injuries. She reported to them, for the first time, that defendant told her he was responsible for the murders of the three Florence brothers. Items taken from Webster were later recovered from Darrin's room in the home he shared with defendant. Inside defendant's jail cell, detectives found a receipt from the jail's canteen with the address of the location where police had been planning to move Webster.

### d. Gang Evidence

Detective Kerry Tripp testified at trial as an expert on gangs. He told the jury that defendant had admitted that he was a member of the Crenshaw Mafia Gangsters, a criminal street gang with about 400 members who tended to congregate in the part of Ingleside known as the Bottoms, on 10th Avenue, south of Bardton. For a gang member to stare at someone or walk up to someone and ask where he is from constitutes a challenge to that person. According to Detective Tripp, when gang members see a car going in the wrong direction on a one-way street, they typically assume it is being driven by either a police officer or a rival gang member.

Detective Tripp also told the jury that none of the Florence brothers was in the police department's gang database, and to his knowledge none of them was a gang member. Brenda Florence, the mother of Christopher, Michael, Torry, and Brian, testified that none of her sons was a gang member or otherwise engaged in criminal activities.

### 2. Defense Evidence

Defendant testified on his own behalf, and admitted he was a member of the Crenshaw Mafia Gangsters. But he denied having anything to do with Christopher's shooting, and claimed that he spent that evening at his mother's

8

home in Downey with his son. He also denied ever talking about that shooting with Webster. Defendant told the jury, furthermore, that he, his brother, and three of their friends had access to a nine-millimeter handgun that was hidden on 10th Avenue behind some mailboxes, but he denied having the gun in his possession on the day that Christopher was shot.

Defendant did acknowledge his involvement in the shooting of Christopher's brothers, but he claimed that he acted in response to perceived threats of violence. He testified that, the morning after Christopher's death, he saw a truck or SUV with two or three people in it driving slowly in the area of the Bottoms. At the time, defendant was standing with a group of fellow gang members. When the vehicle passed by the group, the driver pointed the fingers of his hand at them as if he had a gun. That gesture led defendant to believe they would be back to shoot him. Later that night, at about midnight, he saw Webster in the Bottoms. As they socialized with some friends, one of the friends received a call from some of the "homegirls," asking for help. In response to the call, defendant armed himself with the nine-millimeter handgun, got into Webster's car with her and several others, and drove to a club, which was located in the territory of a rival gang. When the group arrived at the club, defendant learned that his "homegirls," Tonesha, Randi, and Vanessa, had been beaten by some males who had since left the scene. Defendant directed Webster to return to the Bottoms and he got into Tonesha's red Ford Contour with the other two young women. Randi sat in the front passenger seat, Vanessa sat in the rear driver's side seat, and defendant sat in the rear passenger side seat. They started driving back to the Bottoms.

Defendant next offered the jury his account of the incident at the 7-Eleven store that preceded the second shooting. According to defendant, on their way back to the Bottoms, they took a shortcut through a 7-Eleven store parking lot. As

9

they did so, defendant saw a man standing in front of the store wearing a red belt, which defendant believed meant he was a member of the Bloods gang. Defendant asked Tonesha to park the car so he could alert the man that he was not safe because he was standing in the territory of a rival Crips gang. When defendant asked the man where he was from, the man told him he was a member of the Crenshaw Mafia Gangsters, defendant's gang. Defendant did not recognize the man, however, and thought he might be setting defendant up for an assault. When the man then asked defendant where he was from, defendant hit him in the face.

Defendant testified that after leaving the store parking lot, they were near the intersection of Century and Doty when Vanessa told him that some men in another car were staring. Defendant looked over at a Ford Mustang and saw the driver staring at him. He recognized the driver as the man who previously had made the gesture with his hand as if he had a gun. According to defendant, the man rolled down his car window, asked if defendant was from the Crenshaw Mafia Gangsters, and pointed a gun at him. Defendant told the jury he became frightened and started shooting.

Afterward, according to defendant, the group drove back to the Bottoms, where Webster was waiting for him. Defendant got into Webster's car and told her he could not believe what had happened. He directed Webster to the scene of the shooting, and told her that he had to shoot. He told Webster that the driver probably had been hit. Later, defendant's brother Darrin picked him up in his car, where defendant placed his gun under the seat.

Defendant testified further that following his arrest two days after the second shooting, he called Webster a few times and the two exchanged letters. He stopped communicating with her, however, after he received a letter that broached the subject of getting married and having children. In May of 2002, he did not know where Webster was living and was not aware that she was in the witness

10

protection program. He denied speaking to anyone about harming her and denied speaking to her on his brother's cell phone on May 1. Defendant testified that Darrin did give him an address for Webster, which he wrote down. Defendant explained that Darrin had asked him to write to Webster to encourage her not to press charges against Darrin for the May 2002 assault, but defendant never wrote such a letter.

A physician who treated Webster after she was assaulted testified for the defense that Webster told him she did not know who attacked her.

## B. Penalty Phase Evidence

### 1. Prosecution's case in aggravation

The prosecution presented evidence that defendant had one prior felony conviction, a robbery adjudicated in juvenile court, and that he had engaged in violent criminal conduct on four occasions. The prosecution's evidence showed that in May of 2000, defendant attempted to intimidate a witness not to press car theft charges against his brother, and in June of 2000, he robbed and beat a man outside an Inglewood nightclub because he believed the man was gay. The prosecution also presented evidence that a few weeks before shooting Christopher, defendant approached an occupied car and threw a brick through the passenger side window. Other evidence indicated that in October of 2003, subsequent to his arrest for the present murders, defendant stabbed a fellow inmate in the county jail.

The prosecution called various witnesses to testify regarding the impact that the murders of Christopher, Michael, and Torry Florence had had on them and the people close to them. According to the witnesses, at the time Michael and Torry were killed, they both were engaged to be married. In addition, Torry and his fiancée had a young daughter who was very close to her father, and Torry had

11

helped raise his fiancée's two other daughters. The victims' mother, Brenda Florence, testified that Christopher, Michael, and Torry had each graduated from high school and were employed full time. She also told the jury that she felt "as if [she had] been dropped in the pits of hell." According to Mrs. Florence, the loss of her three older sons likewise had been hard on her surviving son, Brian, who had lost 40 pounds and developed a number of medical problems.

### 2. *Defense case in mitigation*

The defense called a number of witnesses who testified about defendant's difficult childhood. According to their testimony, until defendant was five years old, his father spent a lot of time with him and he was a happy child. Defendant also was very close to his brother Darrin. However, his father beat his mother every week, sometimes in front of him. The incidents frightened defendant and caused him to wet the bed. Once, defendant saw his father point a gun at his grandmother.

When defendant was six or seven years old, his mother stabbed his father. The couple soon separated, and defendant lived with his father while his brother Darrin lived with his mother. One year later, defendant came to live with his mother but he continued to see his father regularly and was close to him. When defendant was 13 or 14 years old, however, his father called to say he had to move out of town and he never contacted his children again. At that time, defendant began to associate with an older man in the neighborhood who was a gang member, and defendant eventually joined a gang. When testifying on defendant's behalf, defendant's mother, uncle, and grandmother asked the jury to spare his life.

## II. DISCUSSION

### A. Excusal of Juror for Failure to Deliberate

The jury began guilt phase deliberations after a nine-day trial. After two full days of deliberating, the foreperson informed the court that the jury was deadlocked on all counts. The court directed the jury to continue its deliberations. By the next court day, however, the court had received a series of notes, two of which indicated that Juror No. 5 was not objectively considering the evidence and was refusing to listen to other jurors' views, and that she harbored possible biases with regard to gang members and the police. A note from Juror No. 5 reported that Juror No. 12 was biased. The court individually questioned the foreperson, Juror No. 5, Juror No. 12, and two other jurors who were involved or mentioned in the exchange of notes. The court discharged Juror No. 12 for implied bias based on his friendship with defendant's cousin and failure to report the relationship to the court. The court excused Juror No. 5 for refusing to deliberate.

The court appointed two alternate jurors, and the reconstituted jury began deliberations anew. Three days later, the jury returned verdicts finding defendant guilty on all counts and entering true findings on all of the special circumstance and firearm allegations.

Defendant argues that the court erred in dismissing Juror No. 5 for failing to deliberate. Mindful of the heightened scrutiny umder which the trial court's excusal of a deliberating juror is assessed on appeal, we cannot say with confidence that the record shows as a "demonstrable reality" that there was good cause to discharge Juror No. 5. We therefore agree with defendant that the court abused its discretion in dismissing Juror No. 5 and that the error compels reversal of the judgment in its entirety.

*1. Details regarding the trial court's ruling*

Jury deliberations at the guilt phase began midafternoon on Wednesday, August 18, 2004. On Friday afternoon, August 20, the transcript of defendant's testimony regarding self-defense was read to the jurors at their request. After the readback, the court notified counsel that it had received a note from the foreperson indicating that the jury was deadlocked on all counts. The court found it "astonishing" that the jury would reach that conclusion after only two full days of deliberations. In the court's experience, "That happens only when a juror is not really deliberating." However, the court agreed with defense counsel's observation that there was no indication in the foreperson's note that anyone was not participating, and the court decided accordingly to direct the jury to continue deliberations.

The jury was then summoned into the courtroom. The court did not ask the jurors how they were split or whether they thought they could resolve any deadlock. Instead, the court asked the jurors whether a readback, further explanation of the law, or additional argument would be helpful, and inquired whether any of the jurors had time commitment problems. The court then directed the jurors to continue deliberating, remarking that "given about nine days of testimony, 38 witnesses testified, there are 130 items of evidence, I don't think that any jury in two days can say that they have done everything that can be done in trying to evaluate that evidence and come to a conclusion." The jury resumed deliberations that same afternoon.

On the next court day, Monday, August 23, the court informed counsel that it had received two notes late in the day the previous Friday, and one additional note on Monday morning, after the jury had checked in for the day. A note from Juror No. 5 claimed that Juror No. 12 was biased. She explained that Juror No. 12 had told her and Juror No. 6 sometime before deliberations that he was "close

14

friends" with defendant's cousin, who described defendant as a "cold, heartless killer, and an active criminal."

A note signed by the foreperson indicated that a majority of the jurors felt that one juror was not fulfilling her obligation to objectively consider all of the evidence, and some jurors wondered whether she had accurately disclosed during voir dire her possible sympathies for gang members and mistrust of the police.

The note submitted to the court on Monday morning was signed by "A Concerned Juror," but the clerk identified the author as Juror No. 12. This note identified Juror No. 5 as the reason the jury was deadlocked. It also reported that Juror No. 5 "refuses to listen to the other juror's points on why they are voting the way they are," and that she "either does something on her cell phone or reads her book." According to the note, Juror No. 5 challenged the other jurors to "convince" her she was wrong, and when the other jurors asked how they might persuade her, Juror No. 5 responded, "I don't know. I'm not psychic." The note related moreover that Juror No. 5 indicated she had once lived near the Bottoms and had friends who were gang members, and that she believed police officers are corrupt.

After seeking input from counsel for both sides regarding how an inquiry should proceed, the court decided to interview the foreperson and Juror No. 5, Juror No. 6, and Juror No. 12. At the prosecutor's suggestion, the court later decided to also interview Juror No. 11, who had authored the note signed by the foreperson. The court conducted the questioning, but allowed counsel to suggest areas of inquiry or specific questions.

### a. Testimony of the jury foreperson

The court began its inquiry by questioning the foreperson regarding the jury's deliberations generally, and then focused more specifically on Juror No. 5.

15

The foreperson indicated that at the outset of deliberations, all jurors "seemed really eager to talk" and that "conversations were going very nicely. We were testing evidence [and] we were looking into possibilities." According to the foreperson, when Juror No. 5 was "engaging with all of us, she's very articulate" and "seems bright." Later, according to the foreperson, "we started to not get so much input" from Juror No. 5. For example, "we would start to feel sort of a consensus going and then we would somehow just try to integrate her into the conversation." But she "just seemed a little less open minded" and was unable "to weigh the evidence in a more objective fashion to accept anything." The foreperson indicated that he would not describe Juror No. 5 as "passive or anything like that, but just not willing to make a larger decision." As he explained, "when it came down to making a call on a specific piece of evidence, [Juror No. 5] would get choked up by too many possibilities . . . ."

With regard to the day the jury indicated it was deadlocked on all counts, the foreperson explained that the jury had stalled on "the big crux of the matter" and tried to work on other counts. But it "kept coming back to . . . a difference of perception, I guess," and the jury explored other means to introduce points of view. "We would come up with a theory, we'd test it, . . . and it seems as though at that point [Juror No. 5] just really didn't even participate. She just kind of sat there."

According to the foreperson, some of the other jurors were getting frustrated. He explained that Juror No. 5 "has her feelings, this is the way she looks at things. . . . It seems like she brought in a lot of preconceptions" based on her association with gang members. She also "comes up with a lot of possibilities and says things in large general terms that anything is possible and any person can do anything , . . . but then she doesn't really grasp on to what can be probable." The foreperson further reported that the jurors felt that Juror No. 5's comments

16

regarding police officers' untruthfulness came "out of nowhere." But when asked whether Juror No. 5 had made any statement during deliberations that would indicate a bias regarding gang members or the police, the foreperson replied, "No direct comments. You get more of a feeling I suppose."

In response to the court's question whether the foreperson did anything to encourage Juror No. 5 to join in when she seemed not to be participating, the foreperson indicated that he did so indirectly by commenting to the jury as a whole that it is not easy to look at the evidence objectively and to make decisions, but we have to do so at a certain point. The foreperson added that "it just seems our discussions don't hold any water with her as well as our different means to determine the truth in this. . . . There is a point where she doesn't even look anymore. . . . She doesn't observe, she doesn't participate at all. She maybe looks at her book," or her trial notes, or messages on her cell phone. When the court asked how often Juror No. 5 was using her cell phone, the foreperson replied, "I don't think really at all that much" and admitted that someone else brought that to his attention; he himself had not noticed it.

### b. Testimony of Juror No. 6

Juror No. 6 was with Juror No. 5 when Juror No. 12 indicated to them at some point prior to deliberations that he was acquainted with defendant's cousin. The court briefly examined Juror No. 6 with regard to that encounter, which she did not recall in any significant detail. The court also inquired about Juror No. 5's conduct during deliberations. Juror No. 6 reported that Juror No. 5 looked at a book and a cell phone "one or two times" for "a few minutes." When asked whether Juror No. 5 was deliberating, Juror No. 6 indicated that Juror No. 5 had been participating, that she's "tried," but that she's "already made a conclusion." The court then asked whether, after Juror No. 5 had made that conclusion, she was

17

no longer listening to what the others say and expressing her opinion further. After a confusing exchange that suggested an affirmative answer to that question, the court asked, "So . . . after drawing that conclusion, she's not at that point participating further?" Juror No. 6 replied, "Right. That's right." With regard to Juror No. 5's possible bias regarding gang members and police, Juror No. 6 indicated that Juror No. 5 said during deliberations that the police are sometimes untrustworthy and that she is acquainted with some gang members, and therefore "kind of knew how they thought," but gave no specifics.

### c. Testimony of Juror No. 5

Much of Juror No. 5's testimony focused on the conversation in which Juror No. 12 informed her and Juror No. 6 that he had recently discovered that his close friend was defendant's cousin.

The court further inquired into the issue of Juror No. 5's book and cell phone. When the court asked Juror No. 5 whether she had been reading a book during deliberations, she replied, "Oh, no." In response to the court's question whether she had been looking at her cell phone during deliberations, Juror No. 5 responded, "No, only on breaks. [¶] Or maybe I'll look at the time, but I won't call in or text messages." She denied hearing the court direct jurors to turn off their cell phones during deliberations.

With regard to deliberations, Juror No. 5 denied having formed opinions to the point that she was not willing to discuss the evidence with other jurors. She also indicated that she was freely discussing the issues with the other jurors, analyzing what they said, and making points in response.

The court also questioned Juror No. 5 regarding possible bias. When asked directly whether she had any concerns or biases regarding gang members or the police, for or against either group, she replied, "No."

18

### d. Testimony of Juror No. 11

Juror No. 11 was the author of the note asserting that one juror was not fulfilling her obligation to objectively consider all of the evidence, and questioning whether that juror had accurately disclosed during voir dire her possible biases with regard to gang members and law enforcement. The court elicited from Juror No. 11 that the juror in question was Juror No. 5. According to Juror No. 11, Juror No. 5 indicated that she had a lot of friends who are or were gang members, and that she believed police officers coach witnesses and manufacture crime scene evidence to maintain consistency with their theory of the case.

### e. Testimony of Juror No. 12

The court's examination of Juror No. 12 focused solely on the disclosure that he was close friends with defendant's cousin and his failure to report that relationship to the court at the time he discovered the connection. Although Juror No. 12 admitted having several conversations with his friend while the trial was pending, he asserted that the subject of the case never arose. He also indicated that his friendship would have no effect on his ability to be a fair juror. The court asked no questions pertaining to the assertions in the anonymous note regarding the jury deadlock and Juror No. 5's conduct during deliberations.

### 2. The trial court's rulings

After the jurors' testimony and an exchange between the court and counsel, the court announced that, based "on what we've heard, the testimony we've taken," both Juror No. 5 and Juror No. 12 should be excused.

With the assent of counsel for both sides, the trial court first ruled it would discharge Juror No. 12 for implied bias, based on his acquaintance with defendant's cousin and his failure to report that relationship to the court. Defense counsel moved for a mistrial on the ground that some of the sentiments regarding

19

gang members expressed by Juror No. 12 during deliberations may have infected other members of the jury panel, but the court denied the motion.

Over defense objection, the trial court then ruled it would discharge Juror No. 5, concluding that she was unable to perform her duty as a juror within the meaning of section 1089. Crediting the testimony of Juror No. 6, the court found that although Juror No. 5 "has deliberated with the other jurors, [she] is now of a fixed opinion, is not deliberating further." The court observed that Juror No. 5's lack of participation in the deliberation process was further evidenced by her "taking time outs with the cell phone and the book," as reported by the foreperson. The court also expressly found that it did not believe Juror No. 5's statements at the hearing. For example, the court later explained, Juror No. 5's "denial of so many of the things [said by the other jurors] caused me to believe that she was not being truthful when she talked to us about the use of the cell phone."

The court clarified that the basis of its decision to discharge Juror No. 5 was her failure to deliberate further, which was corroborated by her "time outs" with the cell phone and book. The court observed, "in addition and separately," that the testimony of Juror No. 11 regarding Juror No. 5's statements to the effect that she has or has had gang member friends expresses a bias on her part that she did not disclose during voir dire.

The two excused jurors were replaced with alternates, and the court instructed the jury to set aside all past deliberations and begin deliberations anew. The reconstituted jury began deliberating on Monday afternoon, August 23. On Thursday morning, August 26, the jury requested and received additional argument from counsel. Later that same day, the jury returned verdicts of guilt on all charges and found true all of the special circumstance and firearm use allegations.

20

*3. Discussion*

Defendant contends the trial court abused its discretion in excusing Juror No. 5. We agree, for the reasons explained below.

A trial court may discharge a juror at any time during trial if the court finds that the juror is "unable to perform his or her duty." (§ 1089.) A juror who refuses to deliberate may be removed "on the theory that such a juror is 'unable to perform [her] duty' within the meaning of Penal Code section 1089." (*People v. Cleveland* (2001) 25 Cal.4th 466, 475 (*Cleveland*).)

Although this court reviews for abuse of discretion a court's ruling discharging a juror pursuant to section 1089 (*Cleveland, supra*, 25 Cal.4th at pp. 485-486), we have made clear that such review involves a "heightened standard [that] more fully reflects an appellate court's obligation to protect a defendant's fundamental rights to due process and to a fair trial by an unbiased jury." (*People v. Barnwell* (2007) 41 Cal.4th 1038, 1052 (*Barnwell*); see *Cleveland, supra*, at p. 488 (conc. opn. of Werdegar, J.).) Specifically, the juror's "inability to perform" his or her duty "must appear in the record as a demonstrable reality." (*People v. Compton* (1971) 6 Cal.3d 55, 60; accord, *People v. Wilson* (2008) 44 Cal.4th 758, 821; *Barnwell, supra,* at p. 1052.)

Under the demonstrable reality standard, a reviewing court's task is more "than simply determining whether any substantial evidence in the record supports the trial court's decision." (*People v. Lomax* (2010) 49 Cal.4th 530, 589.) "A substantial evidence inquiry examines the record in the light most favorable to the judgment and upholds it if the record contains reasonable, credible evidence of solid value upon which a reasonable trier of fact *could* have relied in reaching the conclusion in question. Once such evidence is found, the substantial evidence test is satisfied. . . . [¶] The demonstrable reality test entails a more comprehensive and less deferential review. It requires a showing that the court as trier of fact *did*

21

rely on evidence that, in light of the entire record, supports its conclusion that [good cause for removing the juror is] established. It is important to make clear that a reviewing court does not *reweigh* the evidence under either test. Under the demonstrable reality standard, however, the reviewing court must be confident that the trial court's conclusion is manifestly supported by evidence on which the court actually relied. [¶] In reaching that conclusion, the reviewing panel will consider not just the evidence itself, but also the record of reasons the court provides." (*Barnwell, supra,* 41 Cal.4th at pp. 1052-1053.)

Applying this heightened standard of review that governs our assessment of a trial court's decision to discharge a juror under section 1089, and based on our examination of the record as a whole, we conclude that the court abused its discretion in discharging Juror No. 5 because her inability to perform her duty as a juror does not appear in the record as a demonstrable reality.

The court indicated that its rulings removing Juror No. 5 and Juror No. 12 were based on "what we've heard [and] the testimony we've taken." That is, the court relied on the testimony of the jurors who were individually examined by the court. Notably, at no point during the hearing did the court refer to the anonymous note submitted earlier that morning. Nor did the court inquire of Juror No. 12 whether he had authored it. From this we can infer that the court did not actually rely on the note to reach its decision to discharge Juror No. 5. Nor did the court rely on the testimony of Juror No. 12 or Juror No. 11. The record shows that neither juror provided any testimony whatsoever on the subject of Juror No. 5's failure to deliberate with fellow jurors.

Juror No. 5 testified she had been freely discussing the evidence with the other jurors, and she denied reading a book or using her cell phone to make calls or read text messages while the rest of the jury was deliberating. The record shows that the court found her not credible, however. As this court explained in

22

*Barnwell, supra*, 41 Cal.4th at page 1053, we afford deference to the trial court's credibility determinations, "based, as they are, on firsthand observations unavailable to us on appeal."

The record shows further that, in reaching its decision to remove Juror No. 5, the court affirmatively relied on the testimony of the foreperson and Juror No. 6. We are not confident, however, that the trial court's determination that Juror No. 5 refused to deliberate "is manifestly supported" by this evidence. (*Barnwell, supra*, 41 Cal.4th at p. 1053.)

"Examples of refusal to deliberate include, but are not limited to, expressing a fixed conclusion at the beginning of deliberations and refusing to consider other points of view, refusing to speak to other jurors, and attempting to separate oneself physically from the remainder of the jury." (*Cleveland, supra*, 25 Cal.4th at p. 485.) Neither the foreperson nor Juror No. 6 suggested that Juror No. 5 entered deliberations with a fixed conclusion about the case and declined to consider the views of other jurors. Indeed, both of them testified to the contrary that Juror No. 5 was deliberating. According to the foreperson, "everybody seemed really eager to talk" when deliberations first began, and Juror No. 5 "was engaging with all of us" and was "very articulate." Juror No. 6 likewise indicated that Juror No. 5 had been participating.

Relying on this testimony, the court expressly found that Juror No. 5 had deliberated with the other jurors. But it also concluded that Juror No. 5 was "not deliberating further," and found that Juror No. 5's reading her book and using her cell phone during deliberations further demonstrated her lack of participation. We can agree that, like the juror who will not sit with her fellow jurors at the deliberations table, a juror who reads a book or looks at messages on a cell phone during deliberations may be attempting to separate herself from the other jurors, and that such conduct may reflect a refusal to deliberate. The court's conclusion

23

in this regard is not manifestly supported by the evidence, however. The foreperson indicated only that Juror No. 5 "*maybe* looks at her book." At one point in his testimony, the foreperson stated more decisively that at one point when he was talking to the entire group during deliberations, Juror No. 5 "had her phone open and was doing some sort of text message." But the foreperson also admitted that he had learned about Juror No. 5's cell phone use from other jurors and that he had not personally witnessed her sending or receiving text messages. Thus, the only evidence supporting the court's finding regarding Juror No. 5's book and cell phone use was the testimony of Juror No. 6, who reported that Juror No. 5 looked at a book and a cell phone "one or two times" for "a few minutes." Such de minimis references to a book and cell phone do not support a determination that Juror No. 5 was refusing to deliberate.

As mentioned above, this court's decision in *Cleveland* provided a nonexhaustive list of scenarios that reflect a failure to deliberate. *Cleveland* also described some of the circumstances that do *not* constitute a failure to deliberate. *Cleveland* observed, for example, that a juror may not be removed for failing to deliberate simply because he or she "does not deliberate well or uses faulty logic or analysis." (*Cleveland, supra*, 25 Cal.4th at p. 485.) Moreover, *Cleveland* explained, "the circumstance that a juror disagrees with the majority of the jury as to what the evidence shows, or how the law should be applied to the facts, or the manner in which deliberations should be conducted . . . is not a ground for discharge." (*Ibid*.)

The foreperson testified that Juror No. 5 was unable "to weigh evidence in a more objective fashion to accept anything" and was "not willing to make a larger decision." The foreperson also related that "when it came down to making a call on a specific piece of evidence, [Juror No. 5] would get choked up by too many possibilities," and that she didn't "really grasp on to what can be probable." But

24

significant evidence in the record shows that the foreperson's testimony regarding the manner in which Juror No. 5 was deliberating amounted to complaints, first, that she was not weighing the evidence in the way that he and the other jurors thought to be objective and, second, that her assessment of the evidence was different from theirs. The foreperson indicated, for example, that Juror No. 5 "has her feelings, this is the way she looks at things." He testified furthermore that the jury's discussions and "our different means to determine the truth in this" do not "hold any water" with her. The evidence regarding Juror No. 5's manner of deliberating does not state a proper ground for her discharge. (*Cleveland, supra*, 25 Cal.4th at p. 485.)

The foreperson also complained that after a good start to deliberations, the jurors "started to not get so much input from" Juror No. 5. As he described it, "We would start to feel sort of a consensus going" and try to integrate her into the conversation, but she "seemed a little less open minded." Juror No. 6 offered a similar account, saying that although Juror No. 5 had been deliberating, she had "already made a conclusion" and was no longer participating. From this testimony the trial court concluded that although Juror No. 5 had been participating, she "is now of a fixed opinion [and] is not deliberating further." That Juror No. 5 was not willing to engage in further discussion, by itself, does not show as a demonstrable reality that she was failing to deliberate. It is not uncommon, or grounds for discharge, "for a juror (or jurors) to come to a conclusion about the strength of a prosecution's case early in the deliberative process and then refuse to change his or her mind despite the persuasive powers of the remaining jurors." (*People v. Bowers* (2001) 87 Cal.App.4th 722, 734.)

In light of our duty to apply a heightened standard of review (*Barnwell, supra*, 41 Cal.4th at p. 1052), we cannot say on this record that Juror No. 5's failure to deliberate is shown as a demonstrable reality. Although the foreperson's

25

testimony related that some of the jurors were frustrated with Juror No. 5, the record indicates that the source of that frustration was her disagreement with their view of the prosecution's evidence. Juror No. 5 "simply viewed the evidence differently from the way the rest of the jury viewed it." (*Cleveland, supra*, 25 Cal.4th at p. 486.) Also apparent from the record is that while deliberating with the other jurors, Juror No. 5 reached a conclusion regarding the strength of the prosecution's case and refused to change her mind. "[T]he court may not discharge a juror for failing to agree with the majority of other jurors or for persisting in expressing doubts about the sufficiency of the evidence in support of the majority view . . . ." (*People v. Engelman* (2002) 28 Cal.4th 436, 446.)

We conclude that the trial court abused its discretion in discharging Juror No. 5. The error is prejudicial and requires reversal of the judgment. (*Cleveland, supra*, 25 Cal.4th at p. 486.) There is no double jeopardy bar to retrial of the case. (*People v. Hernandez* (2003) 30 Cal.4th 1, 6.)

In reversing the judgment in this case, we remind trial courts that the removal of a seated juror for failing to deliberate is a serious matter that implicates a defendant's state and federal constitutional right to a unanimous decision by the jury. (*Barnwell, supra*, 41 Cal.4th at p. 1052.) Although a trial judge has discretion to remove a juror for a failure to deliberate, the exercise of that discretion should be undertaken with great care.

## B. Remaining Claims

In light of our conclusion that the judgment must be reversed, we need not address defendant's assertion that the trial court erred in failing to question all of the jurors regarding their possible exposure to information concerning Juror No. 12's friendship with defendant's cousin. Nor is it necessary to examine his contention that the court's substitution of alternates after the discharge of Juror

No. 5 and Juror No. 12 effectively endorsed the view of a majority of the jurors and had a coercive effect on the alternates.

There is likewise no need to order correction of clerical errors in the abstract of judgment or to address any of defendant's claims relating to the penalty phase of trial. For the purpose of providing guidance in the event of a retrial, however, we address below defendant's claim that the trial court erred in denying his pretrial motions to sever the charges.

Prior to trial, defendant moved to sever the three sets of charges and conduct three separate trials — one on the first shooting (charging the murder of Christopher), one on the second shooting (charging the murders of Michael and Torry and attempted murders of Brian and Floyd Watson), and one on the charges stemming from the assault on Webster. His motion was heard by the judge who presided over several months of pretrial proceedings. The court denied defendant's motion without prejudice, expressing concern that, if the charges were severed, Webster would have to testify twice. Defendant later renewed his motion, this time before the judge who tried the case, asking the court to sever the capital from the noncapital charges. The court determined that "the three incidents can and should be tried together," and denied the motion.

Defendant contends that the courts' rulings amounted to prejudicial error and deprived him of a fair trial. We conclude to the contrary that the court did not abuse its discretion in denying defendant's motions to sever.

Section 954 provides that "two or more different offenses" may be charged in the same pleading if the offenses are either "connected together in their commission" or "of the same class." This "statute permits the joinder of different offenses, even though they do not relate to the same transaction or event, if there is a common element of substantial importance in their commission, for the joinder

27

prevents repetition of evidence and saves time and expense to the state as well as to the defendant." (*People v. Scott* (1944) 24 Cal.2d 774, 778-779.)

The charges were properly joined under section 954, and defendant does not argue otherwise. The two shootings were connected in their commission because the same gun was used in both incidents, and because the evidence suggested that Christopher's brothers were looking for Christopher's killer when they were shot. The assault on Webster was likewise connected to the two shootings because defendant's admissions to Webster regarding both shootings provided defendant with a motive to intimidate her. (See *People v. Valdez* (2004) 32 Cal.4th 73, 119 [murder and escape charges were " 'connected together in their commission' " because "the motive for the escape was to avoid prosecution" on the murder charge].) In addition, the assault induced Webster to report defendant's admissions to police.

Even if charges are properly joined under section 954, the trial court retains discretion to try them separately, but "[t]he burden is on the party seeking severance to clearly establish that there is a substantial danger of prejudice requiring that the charges be separately tried." (*People v. Bean* (1988) 46 Cal.3d 919, 938.) "As we often have observed, because consolidation or joinder of charged offenses ordinarily promotes efficiency, that is the course of action preferred by the law." (*Alcala v. Superior Court* (2008) 43 Cal.4th 1205, 1220 (*Alcala*).) In ruling on a severance motion, "the court must assess the likelihood that a jury not otherwise convinced beyond a reasonable doubt of the defendant's guilt of one or more of the charged offenses might permit the knowledge of defendant's other criminal activity to tip the balance and convict him." (*People v. Bean,* at p. 936.) We review the trial court's decision to deny a severance motion for abuse of discretion. (*Alcala,* at p. 1220.) To establish an abuse of discretion,

28

the defendant must make a " 'clear showing of prejudice.' " (*Ibid*., italics omitted.)

In reviewing a trial court's denial of a motion for severance, "we consider the record before the trial court when it made its ruling." (*Alcala, supra*, 43 Cal.4th at p. 1220.) We first consider whether evidence of each of the offenses would be cross-admissible in "hypothetical separate trials." (*People v. Soper* (2009) 45 Cal.4th 759, 774 (*Soper*).) If the evidence is not cross-admissible, we then consider "whether the benefits of joinder were sufficiently substantial to outweigh the possible 'spill-over' effect of the 'other-crimes' evidence on the jury in its consideration of the evidence of defendant's guilt of each set of offenses." (*People v. Bean*, *supra*, 46 Cal.3d at p. 938.) In making this assessment, "we consider three additional factors, any of which — combined with our earlier determination of absence of cross-admissibility — might establish an abuse of the trial court's discretion: (1) whether some of the charges are particularly likely to inflame the jury against the defendant; (2) whether a weak case has been joined with a strong case or another weak case so that the totality of the evidence may alter the outcome as to some or all of the charges; or (3) whether one of the charges (but not another) is a capital offense, or the joinder of the charges converts the matter into a capital case. [Citations.] We then balance the potential for prejudice to the defendant from a joint trial against the countervailing benefits to the state." (*Soper*, *supra*, at p. 775.)

On the other hand, if the evidence is cross-admissible, "that factor alone is normally sufficient to dispel any suggestion of prejudice and to justify a trial court's refusal to sever properly joined charges." (*Soper*, *supra*, 45 Cal.4th at p. 775.) We conclude that even if the three sets of offenses had been tried separately, evidence of each would have been admissible in the trials of the other

29

two, and that the court was justified in denying defendant's motions to sever the properly joined charges.

Defendant first argues that the three sets of crimes were not sufficiently similar to one another to qualify as cross-admissible on the issue of identity. Defendant correctly observes that the admission of evidence of an uncharged crime under Evidence Code section 1101, subdivision (b), to prove identity[4] requires the highest degree of similarity between the charged offense and the uncharged crime, and that "the offenses must share common features that are so distinctive as to support an inference that the same person committed them." (*People v. Scott* (2011) 52 Cal.4th 452, 472; see *People v. Ewoldt* (1994) 7 Cal.4th 380, 403 [" 'The pattern and characteristics of the crimes must be so unusual and distinctive as to be like a signature' "].) Here, however, the cross-admissibility of the three criminal incidents in hypothetical separate trials does not depend on the application of Evidence Code section 1101, subdivision (b), to prove identity, and the relevance of the three criminal incidents to each other does not derive from their similarity. Rather, their relevance derives from the fact and sequence of their commission. Defendant's desire to avoid prosecution for Christopher's murder provided a motive for the shooting of Christopher's brothers, and his desire to avoid prosecution for both shootings provided a motive for his role in the torture of Webster. (See *People v. Zambrano* (2007) 41 Cal.4th 1082, 1129-1130 [evidence that offenses are similar is "not crucial where the mere *fact* that the

---

**4**     Evidence Code section 1101, subdivision (b), provides in relevant part: "Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, [or] absence of mistake or accident . . .) other than his or her disposition to commit such an act."

defendant committed a prior offense gives rise to an inference that he had a motive to commit a later one"].)

Notwithstanding defendant's assertion to the contrary, the evidence that he committed the second shooting would have been admissible in a separate trial on the first shooting. Specifically, evidence that defendant shot Christopher's brothers only two days after Christopher was shot, when they were in the neighborhood actively looking for their brother's killer, tended to establish defendant's consciousness of guilt with regard to Christopher's shooting, which would be probative of his identity as the perpetrator of that murder. (See *People v. Harrison* (2005) 35 Cal.4th 208, 230 [trial court properly admitted evidence as proof of the defendant's consciousness of guilt, "which in turn was probative of his identity as the perpetrator of the charged offenses"]; see also *People v. Cain* (1995) 10 Cal.4th 1, 32; *People v. Wilson* (1992) 3 Cal.4th 926, 940.)

Defendant's involvement in the first shooting likewise would have been admissible in a separate trial on the second shooting. Because Christopher's brothers were trying to find the person who shot him, Christopher's killer had a motive to eliminate them. At the time they were shot, Michael, Torry, Brian, and Watson were headed toward the location where they planned to meet a woman named "Nicole," who had contacted Michael to tell him she had information about Christopher's killer. Although there was no direct evidence adduced at the preliminary hearing that defendant used "Nicole" to set up Christopher's brothers, the evidence raised a reasonable inference that it was no coincidence defendant happened to pull up next to the brothers' car, and that defendant was aware the brothers likely would be in that place at that time. (See *People v. Arias* (1996) 13 Cal.4th 92, 127-128 [evidence of prior murder would have been admissible in trial on kidnapping and robbery charges because it supplied evidence that the motive for the robbery and kidnapping was to obtain money and transportation to

31

avoid apprehension for the murder].) Evidence of defendant's involvement in Christopher's shooting, because it suggested a motive to shoot Christopher's brothers, also would have had some bearing on the issues of whether defendant intended to kill the brothers and premeditated that shooting. (See, e.g., *People v. Cummings* (1993) 4 Cal.4th 1233, 1284 [evidence of robbery would have been admissible in trial on charge of murdering a police officer, because evidence of the robberies established the motive for killing the officer, and motive to avoid arrest was circumstantial evidence of premeditation and deliberation].)

Finally, evidence of defendant's involvement in both shootings would have been admissible in a separate trial on the torture of Webster as evidence of defendant's motive to prevent her from testifying about his admissions regarding the two shootings. (See *People v. Zambrano, supra,* 41 Cal.4th at pp. 1129-1130 [evidence of assaults would have been cross-admissible in trial on the murder charge to prove that the motive for the murder was to eliminate a witness to the assaults].) And evidence of defendant's involvement in the torture of Webster likewise would have been admissible in separate trials on both shootings to show defendant's consciousness of guilt and therefore, his identity as the perpetrator. (See *People v. Harrison, supra,* 35 Cal.4th at p. 230 [evidence of the defendant's attempt to murder a witness to whom the defendant had admitted his involvement in the shootings was properly admitted in his murder trial as consciousness of guilt evidence].) Finally, the evidence of defendant's involvement in the shootings also would have been admissible on the issue of Webster's credibility, because it explained why she finally reported defendant's admissions to the police. (See *ibid.* [evidence of the defendant's attack on a witness was relevant to the credibility of the witness's testimony that defendant had admitted committing two murders because it explained why "after the attack, [he] told the police about defendant's admission, when he had not previously done so"].)

Defendant argues that there was no evidence presented at the preliminary hearing suggesting that Webster was tortured to prevent her from testifying against him. We disagree. Webster testified that defendant had admitted to her his involvement in both shootings. She also indicated that during the assault at the hotel room, defendant's brother Darrin told her that defendant was " 'stressing out' " and thought that she was " 'snitching him out.' " Webster testified further that defendant called Darrin during the incident and that Darrin asked defendant whether he should kill Webster. When Darrin handed Webster the phone, defendant asked her why she was lying and why she had not put money in his jail account.

Contrary to defendant's assertion, there was ample evidence in the preliminary hearing record from which to draw the inference that Webster was tortured, at defendant's behest, to dissuade her from testifying against defendant. For example, viewing this incident in the context of defendant's admissions to Webster, it could reasonably be inferred that defendant's complaint that Webster had stopped giving him money reflected a concern that she had become disloyal to him.

Defendant further contends that even if each of the charges had some relevance to the others, the evidence of other offenses would not have been cross-admissible in hypothetical separate trials because it would have been excluded as more prejudicial than probative under Evidence Code section 352. He argues, in particular, that in a separate trial on the charge that defendant murdered Christopher, evidence that defendant had shot and killed his two brothers and had attempted to murder the two other passengers in their car, was highly inflammatory and had limited relevance. We are not persuaded. Evidence of the second shooting would have been highly probative in a trial concerning the homicide of Christopher, first, because whoever killed Christopher had a motive to

33

kill his brothers, and second because the subsequent shooting would have tended to show defendant's consciousness of guilt, which in turn would be probative of his identity as the perpetrator of the first shooting, as previously discussed. In addition, although there were more victims in the second shooting, the circumstances of that crime would be no more likely to inflame the jury than would be the circumstances of the first shooting.

Defendant also contends that the evidence of the torture of Tyiska Webster was particularly inflammatory and would have been excluded under Evidence Code section 352 in separate trials on the murder charges because it had little probative value. As explained above, however, evidence of the torture was highly relevant to the murder charges not only because it evidenced defendant's consciousness of guilt, but also because it was relevant to Webster's credibility. Furthermore, it is not clear that the evidence of the crimes against Webster, which involved the prolonged infliction of pain, albeit not directly by defendant, would be more likely to inflame the jury against defendant than evidence of the shootings, which resulted in the deaths of three young men from the same family.

Because evidence of each of the crimes was fully cross-admissible, the trial court did not abuse its discretion in denying defendant's motion to sever the charges.

### III. CONCLUSION

The judgment is reversed in its entirety. Retrial of the case is not barred by the double jeopardy clauses of the state and federal Constitutions.

**CANTIL-SAKAUYE, C. J.**

**WE CONCUR:**

**WERDEGAR, J.**
**CHIN, J.**
**CORRIGAN, J.**
**LIU, J.**
**CUÉLLAR, J.**
**KRUGER, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Armstrong

_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**


_____

**Opinion No.** S130659
**Date Filed:** August 11, 2016

_____

**Court:** Superior
**County:** Los Angeles
**Judge:** William R. Pounders


_____

**Counsel:**

Patricia A. Scott, under appointment by the Supreme Court, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Jaime L. Fuster and Eric J. Kohm, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Patricia A. Scott
1042 Willow Creek Road, #463
Prescott, AZ  86301
(928) 445-8380

Eric J. Kohm
Deputy Attorney General
300 South Spring Street, Suite 1702
Los Angeles, CA  90013
(213) 897-2273