Filed 6/13/24  P. v. Rosales CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>        v.<br><br>JOSE LUIS GUTIERREZ ROSALES,<br><br>        Defendant and Appellant. | F086448<br><br>(Super. Ct. No. BF189911A)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  John W. Lua, Judge.

Matthew Alger, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Michael P. Farrell, Assistant Attorney General, Louis M. Vasquez, Lewis A. Martinez and Hannah Janigian Chavez, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

## INTRODUCTION

Defendant Jose Luis Gutierrez Rosales was arrested for bludgeoning his coworker to death with a metal pipe in 2022 and charged with first degree murder with a sentence enhancement for personal use of a deadly or dangerous weapon. (Pen. Code, §§ 187, subd. (a)/189, subd. (a), 12022, subd. (b)(1).)[1] The jury rejected the prosecution's theory that the murder was willful, deliberate and premeditated, but convicted defendant of the lesser included offense of second degree murder and found the weapon enhancement allegation true. The trial court sentenced defendant to 15 years to life with an additional one year for the weapon enhancement.

On appeal, defendant's sole claim is that the trial court abused its discretion when it discharged Juror No. 4 during deliberations, violating his state and federal rights, and entitling him to reversal of his conviction. The People dispute there was any error.

Given that Juror No. 4's failure to deliberate does not "'appear in the record as a demonstrable reality,'" we find the trial court abused its discretion when it found good cause to discharge her under section 1089. (*People v. Armstrong* (2016) 1 Cal.5th 432, 450 (*Armstrong*).) Because the record indicates that Juror No. 4 was persuaded by defendant's claim of self-defense, the error is prejudicial.[2] (*Armstrong, supra*, at p. 454.) Therefore, we reverse the judgment and remand for further proceedings. (*Ibid.* [no double jeopardy bar to retrial].)

---

[1] All further statutory references are to the Penal Code.

[2] Because we find the trial court erred under state law and the error is prejudicial under *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*), we do not reach defendant's claim of constitutional error. (*People v. Allen and Johnson* (2011) 53 Cal.4th 60, 65 (*Allen and Johnson*); accord, *People v. Wilson* (2008) 44 Cal.4th 758, 814 (*Wilson*).)

# FACTUAL SUMMARY

## I.     Prosecution Evidence

At the time of the murder, defendant had worked for several years for the irrigation division of a farming company near Lamont.  On the morning of April 18, 2022, defendant was assigned to clean up and organize the yard where irrigation pipes were stored, along with Eusebio M. and the victim, Hector "Teto" Castaneda.[3]  Eusebio testified he had his back to defendant and Teto when he heard defendant scream, "'Why did you mess with my family?'"  Eusebio turned around and saw Teto on the ground, face up and not moving, and defendant standing in front of him "'assaulting'" him with a steel pipe.[4]  Eusebio saw defendant hit Teto several times in the face with a forward chopping motion before defendant tossed the pipe and drove off in his vehicle.  Eusebio did not hear anything prior to defendant screaming at Teto and hitting him.

Eusebio called his son, Daniel M., who was also on the irrigation team, but was working in a field under one-quarter of a mile away, and told him that defendant hit Teto.  Daniel testified that just prior to receiving his father's call, he looked over at the yard.  He saw defendant, Teto, and Eusebio, and he saw something fall.  He then saw someone he could not identify delivering blows down toward the ground in an up-and-down chopping motion.  After Eusebio called him, he drove to the yard and saw defendant leaving in a white vehicle.  When he arrived at the yard, Eusebio looked frightened and Teto was on the ground.  Crime scene photos showed a bloody post near Teto's body, which Eusebio identified as the weapon.

---

[3]     Because the victim and defendant's supervisor share the same first name, we refer to the victim by his nickname.

[4]     Evidence showed there were six metal posts on the trailer used for irrigation pipes, to aid in keeping the pipes stable.  At the end of the trailer, the two pipes on each side were attached by chains but the one in the center, which was the murder weapon, was fully removable.

Responding paramedics determined Teto was deceased. The forensic pathologist testified that Teto died from blunt force trauma to the head and neck. He was struck at least seven times, four times in the back of the head and three times in the face; and the lacerations he suffered were caused by being struck with a hard, linear object.

The vehicle defendant drove off in was found abandoned approximately one week later, and defendant was arrested 10 days after the murder at a residence following an anonymous phone call to authorities. Prior to booking, defendant was transported to the hospital because he had self-inflicted cuts to his neck and wrist. After defendant was returned to the jail, prior to the booking, he told a nurse that he cut himself with a knife three days earlier because "he felt bad for what he did to the man." When asked if he was still suicidal, he said, "'Not at this time.'"

## II.    Defense Evidence

Defendant testified that he had worked for the farming company laying pipe in fields for approximately three years. He had known Eusebio and Teto that entire time, and he and Teto also spent time together outside of work. Prior to the murder, there were no arguments, fights, or threats between the two, but he suspected his former girlfriend and Teto were having a relationship. However, he had never confronted Teto with his suspicions and he denied his coworkers teased him about his former girlfriend having sex with people at work. He would see his coworkers laughing and it made him angry, but he did not know why they were laughing.

On the day of the murder, defendant was working with Teto and Eusebio in the yard. After their morning meal break, which they shared with three additional men, they were loading irrigation pipes onto the trailer. Teto bent down at one point and grabbed something. He approached defendant, who had turned away, with a broken section of pipe with a riser in hand. Teto poked the broken riser, which was sharp at the end, in defendant's chest and said, "'You're gonna see now.'" Defendant testified that this drew blood and left a mark on his chest that was visible in a photograph taken just prior to

4.

trial.[5] Teto then went to get on the tractor and said, "'It's worse. You're gonna see now.'" Teto always carried a small, three-inch knife and, fearing Teto was going to get the knife from the tractor, defendant pulled him back down, which caused him to stumble backward, fall, and hit the back of his head on the irrigation pipes. Teto started to get back up. Defendant had the metal post from the trailer in his hand at the time and, in shock and fearing for his life, he struck Teto. He testified that when he hit Teto, he was not looking at Teto and was striking backward.

Defendant testified it was a mistake, and he did not know how many times he hit Teto, but Teto was unconscious. While striking Teto, defendant said something to the effect of, "'So you won't mess with my family.'" He then threw the metal pole and drove away. He testified he was afraid Teto would do something to his children and implied that Teto hung out with questionable people. He also testified that he did not have a plan when he drove away, but Teto was well-known to their coworkers, and defendant was afraid their coworkers might do something to him.

Eventually, defendant's vehicle ran out of gas on the outskirts of Taft. Defendant testified he felt bad and sick, and he stayed out there for days. While out there, he cut his neck and wrist with a small, plastic knife he had for work, staining his shirt with blood, and he "guess[ed] he did want to kill [him]self."

During his interview with detectives following his arrest, defendant did not tell them that Teto attacked him or that he hit Teto while defending himself. He testified that he did not think they cared.

On cross-examination, defendant admitted he killed Teto and fled for 10 days. He testified he cut himself on the day of the murder, and he lost a lot of blood, had a fever, and his head was hurting. He also testified his body would stiffen and he felt dead, and

---

**5**      Defendant did not know what happened to the riser Teto poked him with and it was not visible in the crime scene photographs.

he laid down under the almond trees and walked along the highway, wanting to be seen. However, he did not flag anyone down.

Defendant testified he killed Teto in self-defense and then tried to kill himself, but he conceded he did not tell the police he acted in self-defense or that Teto had a weapon. He admitted hitting Teto in the face approximately three times, but he denied hitting Teto in the back of the head. He reiterated that Teto stumbled and hit the back of his head on the irrigation pipes.

## III.    Rebuttal Evidence

The prosecution introduced defendant's audio-video recorded interrogation statement. Defendant asked for water and food, and he said he had been to the hospital for stitches and antibiotics but felt fine. Defendant said his estranged wife, Maria, "connected with" his supervisor, Hector P., as well as Daniel, Teto, and Jose; and he said they would make fun of him every day because "that man" was with his wife. He also said "that man" humiliated him and separated him from the crew, and he "wanted to take [his] own life." During breaks, defendant's coworkers would dial each other's phones and his supervisor would pretend he was calling Maria. Defendant said that he sometimes saw Maria with his supervisor in a truck and that, "Everyone, the whole world knows, I didn't need to ask."

Defendant referred to the victim as "the man from the accident" and said that day, the two of them were paired with Eusebio to pick up pipes. He felt strange, grabbed a metal pipe, and hit "the man" with his eyes closed. When defendant opened his eyes, Teto was on the ground and he left, not knowing if Teto was dead. He later admitted he thought Teto was dead when he left. Asked why he hit Teto, defendant said Teto had been laughing at him and he was humiliated.

Defendant also told detectives he did not intend to flee and was not hiding, but his phone died. He told detectives he would "answer here, like a man for what I have done."

6.

**DISCUSSION**

**I.      Error in Discharging Juror No. 4 for Failure to Deliberate**

**A.      Legal Principles**

"[R]emoval of a seated juror for failing to deliberate is a serious matter that implicates a defendant's state and federal constitutional right to a unanimous decision by the jury.  [Citation.]  Although a trial judge has discretion to remove a juror for a failure to deliberate, the exercise of that discretion should be undertaken with great care." (*Armstrong, supra*, 1 Cal.5th at p. 454.)  Under state law, "If at any time, whether before or after the final submission of the case to the jury, a juror dies or becomes ill, *or upon other good cause shown to the court is found to be unable to perform his or her duty*, or if a juror requests a discharge and good cause appears therefor, the court may order the juror to be discharged …."  (§ 1089, italics added.)  A trial court's decision to discharge a juror under section 1089 is reviewed for abuse of discretion.  (*Armstrong, supra*, at p. 450, citing *People v. Cleveland* (2001) 25 Cal.4th 466, 485–486 (*Cleveland*).)

However, "such review involves a 'heightened standard [that] more fully reflects an appellate court's obligation to protect a defendant's fundamental rights to due process and to a fair trial by an unbiased jury' (*People v. Barnwell* (2007) 41 Cal.4th 1038, 1052, (*Barnwell*); see *Cleveland, supra*, at p. 488 (conc. opn. of Werdegar, J.)).  Specifically, the juror's 'inability to perform' his or her duty 'must appear in the record as a demonstrable reality.'  (*People v. Compton* (1971) 6 Cal.3d 55, 60; accord, *People v. Wilson* (2008) 44 Cal.4th 758, 821; *Barnwell, supra*, at p. 1052.)

"Under the demonstrable reality standard, a reviewing court's task is more 'than simply determining whether any substantial evidence in the record supports the trial court's decision.'  (*People v. Lomax* (2010) 49 Cal.4th 530, 589.)  'A substantial evidence inquiry examines the record in the light most favorable to the judgment and upholds it if the record contains reasonable, credible evidence of solid value upon which a reasonable trier of fact *could* have relied in reaching the conclusion in question.  Once such evidence

is found, the substantial evidence test is satisfied.… [¶] The demonstrable reality test entails a more comprehensive and less deferential review. It requires a showing that the court as trier of fact *did* rely on evidence that, in light of the entire record, supports its conclusion that [good cause for removing the juror is] established. It is important to make clear that a reviewing court does not *reweigh* the evidence under either test. Under the demonstrable reality standard, however, the reviewing court must be confident that the trial court's conclusion is manifestly supported by evidence on which the court actually relied. [¶] In reaching that conclusion, the reviewing panel will consider not just the evidence itself, but also the record of reasons the court provides.' (*Barnwell, supra*, 41 Cal.4th at pp. 1052–1053, citation omitted.)" (*Armstrong, supra*, 1 Cal.5th at pp. 450–451; accord, *People v. Perez* (2018) 4 Cal.5th 421, 446; *Allen and Johnson, supra*, 53 Cal.4th at p. 71.)

On review, "we afford deference to the trial court's credibility determinations, 'based, as they are, on firsthand observations unavailable to us on appeal.'" (*Armstrong, supra*, 1 Cal.5th at p. 451, quoting *People v. Barnwell* (2007) 41 Cal.4th 1038, 1053; accord, *Allen and Johnson, supra*, 53 Cal.4th at p. 75.) However, "under the demonstrable reality test, courts may not '"presume the worst" of a juror.'" (*People v. Henderson* (2022) 78 Cal.App.5th 530, 563 (*Henderson*), quoting *People v. Bowers* (2001) 87 Cal.App.4th 722, 729 (*Bowers*).)

### B.  Procedural History

#### 1.  Jury Notes Preceding Discharge of Juror No. 4[6]

##### a.  First Note

The jury began deliberating on May 3, 2023, at approximately 2:00 p.m.  At approximately 3:20 p.m., the foreperson sent the following note on behalf of the jury: "More information on what constitutes 2nd degree murder?  More clarification of 'malice'?  Under voluntary manslaughter, more explanation on 'provocation.'"  With the agreement of both counsel, the court responded at 4:00 p.m. by directing the jury to CALCRIM No. 520 in response to the first two questions and CALCRIM No. 570 in response to the third question.

##### b.  Second Note

At 4:17 p.m., the jury requested a transcript of defendant's testimony.  The court ordered readback of defendant's testimony, which was completed at approximately 2:15 p.m. the next day.

##### c.  Third Note

Just over one hour after readback was completed, at 3:25 p.m. on the second day of deliberations, the jury sent a third note stating, "We are at an empasse [*sic*] on whether this is a case of self defense or not self defense."  Over defense counsel's objection, the court read CALCRIM No. 3551 to the jury,[7] and with the agreement of both counsel, the

---

[6]  During trial, Juror No. 4 gave the bailiff a note asking, "'Was the injury to the back of [the victim's] head a cranial fracture or more of a flesh wound bruise?'"  The court addressed the note outside the presence of the other jurors.  Juror No. 4 said she had not discussed her question with other jurors and was able to set it aside until all the evidence was presented.  The People point to this note as evidence that "it was clear from the start that Juror No. 4 would be unable to stay within the confines of the evidence presented at trial."  However, the court did not rely on this note in discharging Juror No. 4 and we do not include it in our discussion.

[7]  The court instructed, "Sometimes juries that have had difficulty reaching a verdict are able to resume deliberations and successfully reach a verdict.  Please consider the following suggestions:  [¶]  Do not hesitate to reexamine your own views.  Fair and effective jury deliberations require a frank and forthright exchange of views.  [¶]  Each of you must decide the case for yourself and form your individual opinion after you have fully and completely

court informed the jury it had options, including further exhibit review or requesting readback of testimony, clarification of instructions, or further argument or comments from counsel.

### d. Fourth Note

At 4:20 p.m., the jury sent a note asking the following questions: "Define self defense from each attorney as it applies to this case? Is there any inventory list from the tractor that we can see? Is the knife used in the attempted suicide available? ([B]oth attorneys) speak to credibility of Defendant's testimony on stand. Speak about conditions of police interview? (Fever, state of mind, badgering.) What happens when any juror/s refuses to look at physical evidence and their mind is made up by bias and speculation and refuses to look at physical evidence and refuses to comprehend[] the process and instructions given by the judge?"

The next morning, in response to the note, defense counsel and then the prosecutor offered their comments to the jury.

### e. Fifth Note

At 11:00 a.m. on the third day of deliberations, approximately 45 minutes after the comments by counsel, the jury sent a fifth note stating, "Juror will not look at evidence and won't acknowledge the defendant[']s physical actions caused the victim[']s death. This person's only response when reviewing evidence is, 'That's your opinion.' Only explanations are speculation, or asking for more evidence. Other jurors feel she is not

---

considered all of the evidence with your fellow jurors. It is your duty as jurors to deliberate with the goal of reaching a verdict if you can do so without surrendering your individual judgment. Do not change your position just because it differs from that of other jurors or just because you or others want to reach a verdict. Both the People and the defendant are entitled to the individual judgment of each juror. [¶] It is up to you to decide how to conduct your deliberations. You may want to consider new approaches in order to get a fresh perspective.

"Let me know whether I can do anything to help you further, such as give additional instructions or clarify instructions I have already given you. [¶] Please continue your deliberations at this time. If you wish to communicate with me further, please do so in writing using the form my bailiff has given you."

either competent, or she is deliberately trying to subvert [the] process. Also she is applying conspiracy to the case. Juror is not keeping an open mind."

### 2. Inquiry of Five Jurors

#### a. Foreperson

Following receipt of the fifth note, the court began an inquiry, starting with Juror No. 3, who was the foreperson. The foreperson identified Juror No. 4 as the juror of concern in the fifth note, and he related that when the jurors looked at the exhibits and testimony, Juror No. 4 would state, "'Well, that's your opinion,'" or "'[t]hat's how you see it.'" Although Juror No. 4 initially based her view on defendant's testimony, which the foreperson acknowledged was appropriate, concerns arose when she started expressing views based on things not in evidence, such as asking why there was no inventory of items in the tractor or where the knife was that defendant stated he cut himself with. Jurors then circled back and started over by looking at police body cam footage. The foreperson stated that Juror No. 4 began counting the trucks in the video and she "wanted to make the number of trucks on-site relevant," but she could not explain why.

The foreperson stated that the jurors discussed their perspective on the evidence and when it was Juror No. 4's turn, she brought up "a lot of conspiracy and speculation. And … the energy turned away from the evidence to really trying to explain to her the juror instruction and what we were there to do," resulting in the fifth jury note. The foreperson reported that everyone was paying attention to the thoughts and ideas of others, but when asked about Juror No. 4 specifically, he said, "I can't state whether she was paying attention. Her thought process takes a little longer. But she really stuck to one thing," and "she would only comment when … she was spoken to or asked her opinion." He said that Juror No. 4 did not refuse to discuss her ideas or thoughts, but was unwilling or unable "to discuss the pros and cons to having an open mind." Instead, she

just repeated what she had said before, which the foreperson relayed caused frustration and prevented the jury from moving to the next item.

When the trial court asked for examples of conspiracy theories or speculation on the part of Juror No. 4, the foreperson responded that Juror No. 4 thought "[t]he people at the job were covering up evidence. They moved the weapon stated by [defendant] that [Teto] had. Basically tampering with the crime scene." She also "speculated on the reason [defendant] stopped hitting [Teto]. When [the jury] took that in[to] consideration and … talked about it, she just repeated over and over … '[h]e stopped when he saw the blood.' [¶] And we couldn't understand where she got that from. It wasn't submitted into evidence that he stopped because he saw the blood." The foreperson commented that jurors saw blood coming from the back of Teto's head, but Juror No. 4 disagreed, saying that defendant did not see blood coming from the back of Teto's head. Relevant to the issue of self-defense, the foreperson opined that if things happened the way Juror No. 4 believed they did, "the blood would [have been] very apparent" when Teto went to get up. Further, Juror No. 4 disagreed that defendant's actions caused Teto's death, she kept referring back to intent, and "[i]t took her quite a few minutes just to agree with the rest of the jurors that [Teto] was dead."

Regarding the statement in the note that other jurors thought Juror No. 4 was either incompetent or trying to deliberately subvert the process, the foreperson said the other jurors, including one of the quietest jurors who just focused on doing his job, drew that conclusion because they were frustrated.[8] That morning, the foreperson concentrated on keeping the other jurors quiet so that Juror No. 4 could express herself, but she fell back on "speculation" concerning defendant's intent or feelings, or a conspiracy to hide

---

[8] The trial court did not find that Juror No. 4 was either incompetent or trying to subvert the process, and we note the absence of any evidence in the record that would have supported such a finding. As we shall discuss, this conclusion reached by Juror No. 4's fellow jurors was driven by their frustration with her views and opinions about the evidence.

something.  Juror No. 4 felt there should have been an inventory list and did not accept that the police body cam footage showing the work site was the evidence they had to consider.  Regarding subversion of the process, the foreperson reported that one of the jurors requested he add that to the note, and that jurors felt Juror No. 4 was incompetent or had made up her mind she was going to vote not guilty and was trying to make the evidence fit her view.  Although the foreperson did not necessarily agree that Juror No. 4 was trying to subvert the process, the other jurors did and he stated, "[T]hat's a possibility from what I've heard, but I'm no professional.  But I just think it's the built-in frustration that we cannot continue to process," despite breaking things down to a minimum.  "[I]t's just a frustration.  I think that's more than anything.  No one in there is a psychiatrist. They don't know."

The court inquired whether Juror No. 4 had an open mind at the start of deliberations or had already made up her mind.  The foreperson thought they were all openminded in the beginning, but Juror No. 4 focused exclusively on testimonial evidence and dismissed the coroner's testimony as opinion.  When Juror No. 4 would not agree on evidence that was "literal[ly]" in front of them, the foreperson began to suspect she had made up her mind when she walked in.  The foreperson said all the jurors were trying to work and "if Juror [No. 4] was able to express her reasons or point to anything that was in front of us, I think it would be a healthy conversation."  However, she continued to speculate.

### b.      Juror No. 5

Based on the foreperson's identification of three jurors with specific concerns, the court next questioned Juror No. 5, who was the quiet juror mentioned by the foreperson. Juror No. 5 believed that the issue was a matter of competence.  He related that Juror No. 4 did not seem to understand what was expected of them despite their best efforts to explain it, and her position remained unchanged from the beginning.  He did not think she grasped any of the concepts or ideas, and when asked for an example, he said they

were instructed not to speculate but she kept going back to the same things and did not seem to give things any thought. Juror No. 5 said Juror No. 4 "kept insisting that there was missing evidence," she engaged in conspiracy theories about what happened and why, and she seemed unwilling "to look at the evidence and come to [a] … conclusion based solely on the evidence." Asked for examples of conspiracy theories, Juror No. 5 said Juror No. 4 thought the farming company was trying to hide something and had hidden or tampered with evidence. She also felt the police did not conduct defendant's interrogation properly and were trying to get him to admit to something.

Juror No. 5 related that Juror No. 4 did not participate in openly discussing her thoughts and ideas, and she kept insisting evidence was missing and speculating about missing items. Juror No. 5 thought they all entered the jury room with open minds, but Juror No. 4 stopped participating within 15 minutes of deliberations beginning, when she stated her opinion and did not move from it. Juror No. 5 said any attempt to persuade Juror No. 4 to have an open mind was met with the response that there was missing evidence and they did not have the whole story. Although Juror No. 5 said it seemed like they were making progress at times and Juror No. 4 was listening, she returned to the same speculative thoughts when asked for her opinion. Juror No. 5 did not think Juror No. 4 merely viewed the evidence differently than they did because they tried repeatedly to convey their thoughts, feelings, and ideas, but it seemed to him that she did not pay attention and had her mind made up. However, Juror No. 4 never refused to speak to other jurors and never separated herself physically from other jurors; she conversed minimally and was calm; and Juror No. 5 said he could tell she tried to gather her thoughts before speaking. Like the foreperson, Juror No. 5 thought the other jurors were all in agreement concerning Juror No. 4.

### c.     Juror No. 9

Next, Juror No. 9 stated that he also thought Juror No. 4 was incompetent because she failed to give any reasons for her opinion, and when other jurors disagreed with her

14.

position on basic facts, she would respond, "'That is your opinion.'" Juror No. 9 said Juror No. 4 responded the same way even when they were discussing *what* a witness said in testimony following readback. Juror No. 4 had not moved from her position or been able to explain her position, and she kept asking for evidence they did not have and stating they could not figure things out without the missing evidence. Juror No. 9 believed Juror No. 4 had her mind made up at the very beginning of deliberations and was trying to make everything fit with her opinion rather than letting the evidence guide her opinion.

Juror No. 4 participated in deliberations, but briefly and without explaining her reasoning. In Juror No. 9's view, Juror No. 4 was not considering other opinions and did not weigh what other jurors had to say. Juror No. 9 reported that they started with the basic fact that Teto was dead, and it took them five minutes to get Juror No. 4 to agree to that fact. She stated she could accept that as a fact with a death certificate. Jurors also included as a fact that Teto was dead because of defendant's actions. Juror No. 4 would not agree to that fact and kept referring to defendant's intent and her belief that when defendant left the scene, he did not know Teto was dead. Juror No. 9 acknowledged it was fine for everyone to have different opinions, but Juror No. 4 was unable to agree on basic undisputed facts. She would simply respond "'that is your opinion'" or veer off topic to unrelated missing evidence. Juror No. 4 wanted inventories of the tractor and the field. When told they did not exist, she opined that people were not doing their job and seemed stuck on what they did not know.

### d. Juror No. 12

Juror No. 12 was responsible for the comment on the note that one juror was either incompetent or trying to subvert the process. Juror No. 12 explained that Juror No. 4 was unable to understand the court's rules and participate in deliberations because she could not agree on the basic undisputed facts such as Teto was dead. Juror No. 12 reported Juror No. 4 also speculated that defendant had COVID-19 during his interrogation, and

15.

she stated that she knew how large-scale farming operations worked and the farming company conspired to cover up Teto's aggression toward defendant. By subverting the process, Juror No. 12 explained she meant that it seemed Juror No. 4 was stalling or unable to answer their questions, taking three or four minutes to answer a direct question. Asked if she could agree that Teto was dead, Juror No. 4 did not respond for five minutes and when asked for her response, said she was still thinking about it.

In Juror No. 12's opinion, from the outset, Juror No. 4 either did not have an open mind or was unwilling to participate in deliberations, and she kept talking about conspiracy theories or asking for evidence they did not have. Juror No. 4 did not think the police did a thorough investigation and were delinquent in failing to inventory everything at the scene. Juror No. 12 did not think Juror No. 4 was considering other points of view because she would respond to discussions by crossing her arms and shaking her head. Juror No. 4 also answered some questions, but not others. Rather than a difference of opinion, Juror No. 12 thought Juror No. 4 did not seem to have a good grasp on what was happening and did not seem to understand what was going on.

### e. Juror No. 4

Finally, upon invitation by the court to comment first, Juror No. 4 opened by telling the court that she felt the other jurors' comments were meant to intimidate and bully her into "surrender[ing her] individual judgment of the facts." She said she and the other 11 jurors simply did not agree, but she had kept an open mind; viewed the evidence; listened to witness testimony and the attorneys' arguments; and both listened to and participated in deliberations. She also stated it was her duty to follow the court's instructions and keep an open mind, she valued the other jurors' views, and she asked other jurors for their individual views, but she felt her "point of view [was] being crushed" because it differed from the other jurors' views, making her "frightened" and "scared." However, Juror No. 4 said she could still be fair to both sides and render a verdict.

Asked about allegations that she was speculating, Juror No. 4 said it was another juror who first stated that the three men who testified—Eusebio, Daniel, and Hector P.—were "[h]iding something." Juror No. 4 stated that the court had instructed them they could accept or reject testimony in whole or in part, and she agreed with the first juror that Eusebio, Daniel, and Hector appeared to be hiding something.

When the court questioned Juror No. 4 about whether she stated that defendant stopped when he saw blood, she said, "Yes. [¶] … [¶] And dropped the pipe and went away." Questioned about whether she was unwilling to accept the victim was dead, she said "I accept death with the death certificate. That was the most accurate. They were inquiring as to what would be the most accurate indication of death. Well, a death certificate, Your Honor."

Juror No. 4 denied saying that she knew how large-scale farming companies work or that the company conspired to cover up Teto's aggression toward defendant, responding, "And how would they operate a farm? I don't know. I've never managed a farm. Those are someone else's words, Your Honor." She also denied saying defendant had COVID-19. She had instead said "he might have had COVID because he did mention in testimony that he had a fever [and] was not feeling well at all." She felt the sheriff's department could have interviewed defendant a day or two later since he had been to the hospital, had not eaten or had enough water, and was given antibiotics. Juror No. 4 denied saying people were covering up or tampering with evidence, but she had said during deliberations, "At that time, they did not know what objects would be used as evidence."

Juror No. 4 denied her mind was made up at the beginning of deliberations and said she told one of the jurors who asked that she was open to changing her mind. She also denied that she refused to consider other jurors' views, failed to engage in deliberations, or simply said, "'[T]hat's your opinion.'" Juror No. 4 said the word "'opinion'" was not part of her vocabulary, but questioned several times about whether

the source of disagreement among jurors was merely a difference of opinion, she said, "Your Honor, I'm gonna go with the vocabulary you used in your statement, and I will say yes." Juror No. 4 agreed she had questions about an inventory list of items in the tractor, if there was an example of the plastic knife defendant said he cut himself with, and definitions of self-defense by each attorney. However, she said she had, and continued to have, an open mind and if certain evidence was not available, then it was not available and they would go with the evidence presented. Juror No. 4 reiterated that she had not refused to speak to other jurors, and she was deliberating, had an open mind, and was judging the case based on the evidence presented and the arguments made.

### 3. Decision to Discharge Juror No. 4

After hearing argument from both attorneys, the trial court made the decision to discharge Juror No. 4 for failing to deliberate, over defendant's objection. The court found the foreperson and Jurors Nos. 5, 9, and 12 more believable than Juror No. 4, but did not make more specific credibility or factual findings on the issue. The court stated that Juror No. 4 had "fixated on speculation or conjecture, as phrased, through conspiracy theories on information that was not provided during the course of the evidence. It is also not information necessarily reasonably inferred from the evidence presented." The court expressed concern over the reports that Juror No. 4 represented she could not make a decision in the case without the information she wanted or thought was missing.

The court noted Juror No. 4's reported desire for an inventory of the tractor, the knife defendant cut himself with, and her opinion that defendant stopped hitting the victim when he saw blood. On the latter point, the court stated it "very well might be wrong," but it could not remember any evidence that would support that belief. Juror No. 4's opinion on that point caused the court "great concern," in addition to Juror No. 4's reported view that she knew how to manage large-scale farming operations and believed the business had conspired to cover up Teto's aggression toward defendant, that others hid or tampered with evidence, that there were improprieties in the police

interview, and that defendant may have had COVID-19. However, the court then qualified its statement, saying, "A number of these examples that the Court just put on the record very well could qualify as reasonable inferences derived from the evidence presented, as Juror [No. 4] indicated to the Court when the Court had an opportunity to ask her questions individually, but certainly not all of them would fall under that exception."

The court reiterated its concern with Juror No. 4's statement that without certain information, she could not make a decision and said, "It is the reliance on information not presented in evidence nor information reasonably derived from evidence that has been presented that results in an inability to render an opinion that gives the Court great pause because it leads to neither side receiving a fair trial based only on the evidence presented in this courtroom and the law that's been provided to the jurors. [¶] While it is apparent to the Court that jurors definitely have differing opinions, not just about, arguably, evidence presented but also about opinions insofar as jurors participating in deliberations or not participating [in] deliberations, it is equally apparent to the Court that, to a certain extent, that there was an agreement on Juror [No. 4], at least with some, not engaging in deliberations, refusing to consider other views of jurors and making up her mind at the beginning of deliberations."

In concluding that it was going to discharge Juror No. 4 under section 1089, the trial court found the facts distinguishable from those in *Cleveland* and stated Juror No. 4 "has in essence refused to deliberate based on her reliance on information not presented during the course of evidence nor derived through reasonable inferences from evidence and her assertion that, without this information, she cannot make a decision." The court also noted that it found the assertions that Juror No. 4 "has had a fixed conclusion at the beginning of deliberations, she has refused to consider other points of view, she has refused to speak to other jurors" more believable. When the court informed Juror No. 4 it

19.

was discharging her, the court told her it found she "refused indirectly to deliberate," and it found the other jurors questioned more credible.

After the court seated an alternate juror, the jury deliberated approximately three hours before returning a verdict of guilty on the fourth day of deliberations.

## C.    Analysis

### 1.    Refusal to Deliberate

"[P]roper grounds for removing a deliberating juror include refusal to deliberate. A refusal to deliberate consists of a juror's unwillingness to engage in the deliberative process; that is, he or she will not participate in discussions with fellow jurors by listening to their views and by expressing his or her own views.  Examples of refusal to deliberate include, but are not limited to, expressing a fixed conclusion at the beginning of deliberations and refusing to consider other points of view, refusing to speak to other jurors, and attempting to separate oneself physically from the remainder of the jury.  The circumstance that a juror does not deliberate well or relies upon faulty logic or analysis does not constitute a refusal to deliberate and is not a ground for discharge.  Similarly, the circumstance that a juror disagrees with the majority of the jury as to what the evidence shows, or how the law should be applied to the facts, or the manner in which deliberations should be conducted does not constitute a refusal to deliberate and is not a ground for discharge.  A juror who has participated in deliberations for a reasonable period of time may not be discharged for refusing to deliberate, simply because the juror expresses the belief that further discussion will not alter his or her views." (*Cleveland, supra*, 25 Cal.4th at p. 485.)

In this case, there is no evidence that Juror No. 4 refused to listen to or speak with other jurors, separated herself physically from other jurors, or expressed a fixed opinion from the outset.[9]  The other jurors who were questioned reported she spoke less than

---

[9]    The record reflects that Juror No. 4 was persuaded early on by defendant's testimony, but holding a preliminary view that one party's case is stronger or weaker, without more, falls short

20.

other jurors or did not speak unless she was spoken to or asked a question, but neither circumstance constitutes a refusal to deliberate. As well, three of the four jurors questioned initially thought everyone entered the jury room with an open mind. The record reflects that later frustration with Juror No. 4 caused the foreperson to think she may have made up her mind from the beginning, but he acknowledged there was "a lot of speculation" concerning Juror No. 4's motives.

Juror No. 9 stated he thought Juror No. 4 did not begin deliberations with an open mind and her mind was made up, but he did not offer any specific facts supporting that opinion. Similarly, Juror No. 12 stated Juror No. 4 did not have an open mind and did not participate in deliberations, but her description of events, too, does not include any specific facts indicating that Juror No. 4 had made up her mind before the jury began deliberations, and her description of events demonstrates that Juror No. 4 did participate in discussion. What Jurors Nos. 9 and 12 instead described was broad frustration with Juror No. 4's thought process, views, and unwillingness or inability to support her own opinions with what they viewed as adequate reasoning.

"[A] trial court should be wary of relying on the *opinions* of jurors, rather than on its own consideration of objective facts" (*Allen and Johnson, supra*, 53 Cal.4th at p. 75) and, in this case, the trial court did not find that Juror No. 4 failed to deliberate by refusing to listen or speak, or separating herself from other jurors. While frustration with

---

of evidencing misconduct by prejudgment. (*Allen and Johnson, supra*, 53 Cal.4th at p. 73; see *Grobeson v. City of Los Angeles* (2010) 190 Cal.App.4th 778, 784 [Misconduct occurred where juror stated, mid-trial, "'"I made up my mind already. I'm not going to listen to the rest of the stupid argument."'"].) As the court stated in *Allen and Johnson*, "The reality that a juror may hold an opinion at the outset of deliberations is, as we have noted [citation], reflective of human nature. It is certainly not unheard of that a foreperson may actually take a vote as deliberations begin to acquire an early sense of how jurors are leaning. We cannot reasonably expect a juror to enter deliberations as a *tabula rasa*, only allowed to form ideas as conversations continue. What we can, and do, require is that each juror maintain an open mind, consider all the evidence, and subject any preliminary opinion to rational and collegial scrutiny before coming to a final determination." (*Allen and Johnson, supra*, at p. 75.)

Juror No. 4's thought processes and her apparent inability to convey her reasoning adequately to satisfy the other jurors is clear from the record, "it is not required that jurors deliberate well or skillfully" (*People v. Engelman* (2002) 28 Cal.4th 436, 446, citing *Cleveland, supra*, 25 Cal.4th at p. 485), and her manner of deliberating is not grounds for discharge (*Armstrong, supra*, 1 Cal.5th at p. 453).

In *Armstrong*, the California Supreme Court explained, "[A] juror may not be removed for failing to deliberate simply because he or she 'does not deliberate well or relies upon faulty logic or analysis.' [Citation.]  Moreover, … 'the circumstance that a juror disagrees with the majority of the jury as to what the evidence shows, or how the law should be applied to the facts, or the manner in which deliberations should be conducted … is not a ground for discharge.'" (*Armstrong, supra*, 1 Cal.5th at p. 452, quoting and citing *Cleveland, supra*, 25 Cal.4th at p. 485.)  "It is [also] not uncommon, or grounds for discharge, 'for a juror (or jurors) in a trial to come to a conclusion about the strength of a prosecution's case early in the deliberative process and then refuse to change his or her mind despite the persuasive powers of the remaining jurors.'" (*Armstrong, supra*, at p. 453, quoting *Bowers, supra*, 87 Cal.App.4th at p. 734.)  Many of the jurors' complaints, as previously summarized, fall within the scope of what the California Supreme Court has expressly stated does "*not* constitute a failure to deliberate." (*Armstrong, supra*, at p. 452.)  We reiterate that "[i]n deciding whether to discharge a juror for misconduct, a court should focus on its own consideration of a juror's *conduct*. The court cannot substitute the opinions of jurors for its own findings of fact." (*Allen and Johnson, supra*, 53 Cal.4th at p. 75.)

### 2.    Reliance on Speculation, Conjecture, and Conspiracy Theories

The trial court specifically concluded that Juror No. 4's reliance on speculation, conspiracy theories, and conjecture constituted a failure to deliberate.  We find no evidence that Juror No. 4 imported conspiracy theories or rank speculation into her decisionmaking.  The foreperson reported that Juror No. 4's "thought process takes a little

22.

longer," and Juror No. 5 reported that "[y]ou can tell she[] tries to gather her thoughts before she says anything." However, the record reflects that her viewpoint was informed by defendant's testimony, inferences she drew from the evidence, her assessment of witness credibility, and defense counsel's arguments. While Juror No. 4's viewpoint was at odds with that of the other jurors, holding a minority viewpoint does not render her thoughts or conclusions unreasonable.

One issue raised by jurors that drew the trial court's attention was Juror No. 4's view that defendant stopped hitting Teto and walked away after he saw blood. Despite equivocating that it "very well might be wrong," the court nevertheless cited it as "[o]ne example where there was no evidence presented .…" The record, however, contradicts the court and the other jurors on this point.

During defendant's testimony, which was read back to the jury, the following exchange occurred:

> "[PROSECUTOR:] What happened to [Teto] after you hit him about three times, you said?
>
> "[DEFENDANT:] He—he remained in that area, unconscious. I really didn't see. Because I just noticed there was a lot of blood. And I just started walking this way.
>
> "[PROSECUTOR:] At that point, what did you do with the metal tube that was in your hand?
>
> "[DEFENDANT:] I threw it from here to there like this."

When Juror No. 4 was questioned, she acknowledged she said to other jurors, "'He stopped when he saw blood,'" and she added to the court, "And dropped the pipe and went away." Defendant's express testimony clearly supports Juror No. 4's view that defendant threw the pipe and walked away when—because—he noticed Teto was bleeding. That only Juror No. 4 found defendant's testimony persuasive is immaterial. Her viewpoint was supported by evidence, and there is no factual support for a finding

that she committed misconduct in this regard by forming an opinion based on facts not in evidence.

The court also mentioned Juror No. 4's view that the farming company was conspiring to cover up Teto's aggression toward defendant, evidence was hidden or tampered with, the police did not interview defendant properly, and defendant may have had COVID-19. As previously stated, the court commented, "A number of these examples that the Court just put on the record very well could qualify as reasonable inferences derived from the evidence presented, as Juror [No. 4] indicated to the Court when the Court had an opportunity to ask her questions individually, but certainly not all of them would fall under that exception." As such, it is not clear from the record which, if any, of these concerns formed the basis for the trial court's conclusion that Juror No. 4 failed to engage in deliberations, and "'[u]nder the demonstrable reality standard, … the reviewing court must be confident that the trial court's conclusion is manifestly supported by evidence on which the court actually relied.'" (*Armstrong, supra*, 1 Cal.5th at p. 451.) Nevertheless, these concerns bear mention because the record does not indicate that Juror No. 4's views were untethered from the evidence.

"'A jury's verdict in a criminal case must be based on the evidence presented at trial, not on extrinsic matters'" (*Wilson, supra*, 44 Cal.4th at p. 829, quoting *People v. Leonard* (2007) 40 Cal.4th 1370, 1414), and inferences drawn must be reasonable in view of the record (*People v. Ware* (2022) 14 Cal.5th 151, 167). "'"[A] reasonable inference … 'may not be based on suspicion alone, or on imagination, speculation, supposition, surmise, conjecture, or guess work.'"'" (*Id.* at p. 167.) Misconduct occurs, for example when a juror "conduct[s] an improper experiment, visits[s] the crime scene by h[er]self, or consult[s] a dictionary." (*Wilson, supra*, at p. 831.)

Defendant testified that he killed Teto, whom he knew to carry a knife, in self-defense after Teto confronted him by poking him with a broken riser and threatening that "'[defendant was] gonna see now.'" The broken riser was neither in evidence nor visible

in any of the crime scene photos or body cam video, and during closing argument, defense counsel argued:

> "Obviously, there's a question about the weapon, which is this riser, which is normally connected to those larger pipes, but you've seen how there's a seam and those can break off or be taken off. That was used against my client in this case. Well, question being, okay, if that weapon was used, then where is it? Right?
>
> "Now, he didn't try to make something up to say—to point out something that was there and say, yes, that was what was used against me. He honestly told you what was used against him and honestly told you that he doesn't know what happened to it.
>
> "What do we know about the scene, though, after this event? When Deputy Monsibais shows up, there are already quite a few people, some of whom are arriving around [Teto] or standing next to him, milling about here. Trucks in the area. We have a lot of people in this area.
>
> "Again, nobody necessarily knows what all of the evidence is going to be, what all is related to this event, and things can be moved unintentionally, intentionally. We just don't know what happened to that item. And there is no apparent sort of thorough search around that area to find out, you know, what was in that area or if there's anything of evidentiary value that can help out. [¶] We also do know that this object here was moved from some other nearby location. Unclear where. So there was movement of items at the scene after this happened. It was moved by a firefighter and paramedic. This PVC pipe here was moved to that location too. These are some—looks like bags from the paramedics from the ambulance. [¶] So there were movement of things around. Again, not knowing what would have evidentiary value, those things were being moved around."

During further argument after receipt of the fourth jury note, defense counsel again addressed the missing riser, stating, "[Defendant] described in detail what it was, one of these risers. And he doesn't know where it is. We don't have to establish where it is. We don't have the burden of proving anything. He wasn't present after this occurred. So we don't know where it is. But he didn't make something up just to fit it to what was found at the scene."

There was no evidence of a conspiracy to tamper with crime scene evidence by the farming company or the police, but there was more than one possible explanation for the missing riser. One obvious possibility is that defendant lied about Teto confronting him with a broken riser. If persuaded by defendant's testimony on this point, another reasonable possibility is that the riser was just kicked away or otherwise moved because its relevance to Teto's death was not apparent to anyone on the scene that day. Juror No. 4 appeared to be persuaded by defendant's testimony and self-defense claim, as her thoughts and opinions centered around those issues. Neither faulty logic nor the inability to explain herself well to her fellow jurors was grounds to discharge Juror No. 4, however (*Armstrong, supra*, 1 Cal.5th at p. 452; *Cleveland, supra*, 25 Cal.4th at p. 485), and we may not presume the worst of her (*Henderson, supra*, 78 Cal.App.5th at p. 563).

Juror No. 4 denied saying that she knew how large-scale farming operations worked and that the farming company was conspiring to hide evidence,[10] but she did not believe Eusebio, Daniel, and Hector were telling the entire truth. In explaining herself, she said that it was another juror who first said the three men were hiding something. She pointed out that the court told jurors they could accept all, some, or none of testimony as true, and it appeared to her the witnesses were hiding something. Viewed in the foregoing context, Juror No. 4's "'inability to perform' … her duty '[does not] appear in the record as a demonstrable reality.'" (*Armstrong, supra*, 1 Cal.5th at p. 450.)

Regarding defendant possibly having COVID-19 and Juror No. 4's opinion that law enforcement should have waited to interrogate defendant, defendant was arrested

---

[10] As previously summarized, the trial court found Juror No. 4 less credible than the foreperson and Jurors Nos. 5, 9, and 12, but it made no specific findings. Thus, we cannot tell from the record whether this is one of the issues upon which the court based its ruling or to what extent it found Juror No. 4's explanation credible or uncredible. (*Armstrong, supra*, 1 Cal.5th at pp. 450–451 ["'The demonstrable reality test entails a more comprehensive and less deferential review. It requires a showing that the court as trier of fact *did* rely on evidence that, in light of the entire record, supports its conclusion that [good cause for removing the juror is] established.'"])

10 days after Teto was killed.  He did not tell detectives he acted in self-defense because Teto attacked him and when he testified, he explained he did not think that they would care or that anything was going to "save [him] from jail."  He also said he had lost a lot of blood, did not feel well, had a fever, and had just received antibiotics at the hospital.  During his interrogation, he asked for water, said he had not eaten, and described the antibiotics as "strong pills."

Jurors were free to believe or disbelieve defendant's testimony that he was ill when interrogated and, if they believed he was, to decide what effect, if any, that might have had on his interrogation statements, including his failure to claim self-defense.  The record indicates Juror No. 4 was persuaded by this testimony and she was free to view his description of his symptoms through the lens of her own personal experience with illnesses, including COVID-19, among other possibilities.  As our high court explained in *Allen and Johnson*, "[A] distinction must be drawn between the introduction of new facts and a juror's reliance on his or her life experience when *evaluating* evidence."  (*Allen and Johnson, supra*, 53 Cal.4th at p. 76.)  "[T]he distinction between the introduction of new facts and reliance on experience to evaluate evidence [is] as follows:  'Jurors' views of the evidence … are necessarily informed by their life experiences, including their education and professional work.  A juror, however, should not discuss an opinion explicitly based on specialized information obtained from outside sources.  Such injection of external information in the form of a juror's own claim to expertise or specialized knowledge of a matter at issue is misconduct.'"  (*Ibid.*, quoting *In re Malone* (1996) 12 Cal.4th 935, 963.)

In *Allen and Johnson*, an eyewitness, who identified Allen as the shooter in two murders despite the witness's timecard placing him at work elsewhere at the time, testified that he and his coworker, "'Jose,'" often clocked in for one another to cover absences.  (*Allen and Johnson, supra*, 53 Cal.4th at p. 64.)  Based on his own work experience, the discharged juror disbelieved the witness's explanation because in his

view, Hispanic workers would not falsify timecards. (*Id.* at p. 68.) The California Supreme Court disagreed with the trial court that the discharged juror committed misconduct by relying on facts not in evidence. (*Id.* at p. 77.) The court concluded that the juror properly "relied on his life experience in evaluating [the witness's] credibility," and the record did not demonstrate that the juror "ignored or substituted his own beliefs for the court's legal instructions." (*Ibid.*) Here, too, there is no evidence Juror No. 4 disregarded the court's instructions based on her own beliefs, and she evaluated defendant's claim of illness and fever through the lens of her own experience with or knowledge of illness, which, by 2023, would almost certainly include COVID-19. This does not constitute misconduct. (*Id.* at p. 78; accord, *People v. Linton* (2013) 56 Cal.4th 1146, 1195 ["A juror's application of his or her everyday life experience to the evaluation of evidence is not misconduct."].)

### 3. Inability to Make Decision

Finally, the trial court expressly found that Juror No. 4 "in essence refused to deliberate based on her … assertion that, without [certain] information, she cannot make a decision." The court's finding in this regard appears based on Juror No. 9's statements that, in response to certain items or information that were not in evidence, Juror No. 4 said, "[W]e cannot figure this out because we don't have this evidence," "'We can't talk about this because there is not an inventory taken of the field,'" and "'Well, then we don't know about anything else.'" This falls well short of establishing that, by a demonstrable reality, Juror No. 4 was unable to discharge her duty as a juror because she could not or would not render a decision in the case.

Juror No. 4 did not say anything during the court's inquiry of her that indicated she would not or could not make a decision in the case, and her responses reflected understanding of the court's instructions, including that she could accept or reject a witness's testimony in full or in part; the evidence; and the attorneys' arguments. Juror No. 4's focus on issues that favored the defense was clearly a source of frustration for the

28.

other jurors, as they were not similarly persuaded.  However, there is no evidence in the record that the jury took a vote and Juror No. 4 refused to participate or that she told other jurors she could not decide between guilty and not guilty without further information.  Rather, the record indicates that Juror No. 4 and the other 11 jurors viewed the evidence differently.  Juror No. 4 was persuaded by defendant's claims of self-defense and illness at the time of the interrogation, and by defense counsel's argument concerning the missing riser; and she felt Eusebio, Daniel, and Hector were not entirely forthcoming.  These were all views about the evidence and witness credibility that Juror No. 4 was entitled to draw.

Based on the foregoing, we conclude that the record does not show, to a demonstrable reality, that Juror No. 4 could not or would not deliberate.  Therefore, it was an abuse of discretion for the trial court to find otherwise.

## II. Prejudice

Defendant argues that the violation of his state and federal rights necessitates reversal, even if measured under *Watson* or *Chapman* rather than treated as a structural error.  The People do not address prejudice and instead confine their arguments to the absence of error.  We find the court's error under state law prejudicial under *Watson*, necessitating reversal.

Under the California Constitution, "No judgment shall be set aside, or new trial granted, in any cause, on the ground of misdirection of the jury, or of the improper admission or rejection of evidence, or for any error as to any matter of pleading, or for any error as to any matter of procedure, unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice." (Cal. Const., art. VI, § 13.)  "California law generally interprets its constitutional miscarriage of justice requirement 'as permitting reversal only if the reviewing court finds it reasonably probable the result would have been more favorable to the appealing party but for the error' [citations]." (*In re K.H.*

(2022) 84 Cal.App.5th 566, 607, quoting *In re Celine R.* (2003) 31 Cal.4th 45, 60 [ citing *Watson, supra*, 46 Cal.2d at p. 836].)

In the context of state statutory error, the Court of Appeal explained in *Henderson*, "[A]n abuse of discretion in discharging a juror under section 1089 'requires reversal only if it is reasonably probable that a result more favorable to the defendant would have been reached but for the error.'"[11] (*Henderson, supra*, 78 Cal.App.5th at p. 564, quoting *Bowers, supra*, 87 Cal.App.4th at p. 735; accord, *Barton, supra*, 56 Cal.App.5th at p. 516.) Discharge of a deliberating juror leaning in favor of the defendant is obviously prejudicial. (*Henderson, supra*, at pp. 565–566; accord, *Barton, supra*, at p. 516.) Given that the record reflects Juror No. 4 found defendant's testimony that he acted in self-defense persuasive, the error in discharging her is prejudicial and reversal is required. However, retrial is not barred under the double jeopardy clause. (*Armstrong, supra*, 1 Cal.5th at p. 454.)

---

[11] In *Armstrong* and *Cleveland*, the California Supreme Court found the trial court abused its discretion in discharging a juror and reversed, without discussion of the operative standard. (*Armstrong, supra*, 1 Cal.5th at p. 454; *Cleveland, supra*, 25 Cal.4th at p. 486; accord, *Allen and Johnson, supra*, 53 Cal.4th at p. 79; *Wilson, supra*, 44 Cal.4th at p. 841.) However, as discussed in *Henderson, supra*, 78 Cal.App.5th at pages 564–566, the prejudice was obvious, as the discharged jurors in those cases held views that favored the defense. (*Armstrong, supra*, at p. 444 [unfavorable view of police and favorable view toward gang members in gang-related murder prosecution]; *Cleveland, supra*, at pp. 485–486 [belief no crime was committed in attempted robbery case]; accord, *Allen and Johnson, supra*, at p. 66 [disbelief of key prosecution eyewitness and statement prosecutor did not have a case]; *Wilson, supra*, at pp. 813–814 [lone juror holding out in favor of life in capital case]; *People v. Barton* (2020) 56 Cal.App.5th 496, 516 (*Barton*) [lone juror holding out for not guilty].)

**DISPOSITION**

The judgment is reversed, and this matter is remanded for further proceedings, which may include, at the prosecution's election, retrial.

MEEHAN, J.

WE CONCUR:

PEÑA, Acting P. J.

SNAUFFER, J.