Filed 6/10/26  P. v. Bowman CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D087167 |
| Plaintiff and Respondent, | (Super. Ct. No. FVI21002448) |
| v. | |
| EARL DEE BOWMAN, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Bernardino County, Melissa A. Rodriguez, Judge.  Reversed.

Patricia J. Ulibarri, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Chief Assistant General, Eric A. Swenson, Supervising Deputy Attorney General, Christine Y. Friedman and Tyler L. Krentz, Deputy Attorneys General, for Plaintiff and Respondent.

On the third day of deliberations, when the jury had been divided 11-1, the trial court discharged Juror No. 1 for failure to deliberate. After less than an hour of deliberations, the newly-constituted jury convicted Earl Dee Bowman of second degree murder (Pen. Code,[1] § 187, subd. (a)) and found true firearm enhancements alleging that Bowman personally used and intentionally discharged a firearm which caused injury or death. (§ 12022.53, subds. (b)–(d).) The trial court sentenced Bowman to 15 years to life and imposed a consecutive determinate term of 20 years for discharging a firearm.

Bowman contends the trial court erred by discharging Juror No. 1 without good cause in violation of his rights under the Sixth Amendment. We agree. Our review of the record does not reveal it was a demonstrable reality that the discharged juror refused to deliberate. Rather, the juror listened to all the evidence, participated to some extent in the discussions in the jury room, and remained willing and able to vote concerning the verdict. The judgment is reversed.

FACTUAL AND PROCEDURAL HISTORY

Because the sole issue on appeal pertains to removal of Juror No. 1, we include only a brief summary of the trial evidence. We quote extensively the statements of the court and the jurors.

A. *The Killing of Lozano*

Bowman planned to buy drugs from Anthony Lozano. As he was walking to meet Lozano, Bowman flagged down a friend, A.A., who was driving by, and asked for a ride. Bowman told A.A. he was going to go pick up some marijuana and offered A.A. $20 for gas.

---

[1]    All further statutory references are to the Penal Code.

2

A.A. drove Bowman to an apartment complex and parked the car. Bowman said he would be right back and got out of the car.

A.A. heard a loud sound and then Bowman came running "full force" back to the car. A.A. saw that Bowman had a gun. Bowman got in the car and told A.A. to drive him home. Bowman told A.A. to "take small streets, no big streets." During the drive, Bowman called "Jerry" and said "You don't . . . to come get your gun. I just caught a body with it."

Law enforcement discovered Lozano, with a gunshot wound behind his left ear, in the driver's seat of a BMW crashed into the side of a parking garage. There was a significant amount of blood in the driver's side and the passenger's side front compartments. Law enforcement found a fired cartridge casing on the driver's seat of the BMW and observed a bullet hole on the inside of the passenger side door. They did not locate a gun inside the vehicle.

Lozano was taken to the hospital and survived for several days. Two days after the shooting, Bowman posted a message on social media that said, "I tried to cook the chicken, but the chicken was still raw." Bowman testified that his message meant he had shot Lozano but Lozano had not yet died.

Lozano died on July 7, about a week after the shooting. The cause of death was a gunshot wound of the neck. The trajectory of the bullet went left to right from the back of his neck to the front.

Bowman testified in his own defense at trial. He said he set up a meeting to buy Xanax and marijuana from Lozano for $270. Bowman had never dealt with Lozano in person before and was nervous that he could be robbed during his purchase, so he got a firearm. He got a ride from A.A., hopped a fence, and approached Lozano's car. Bowman looked into the window of Bowman's car and asked Lozano for the pills. Lozano pulled them

3

out of the center console of the car and poured them out into his hand. Bowman then saw Lozano drop his head down and start reaching to his left and then to his right, which made Bowman believe Lozano was reaching for a weapon. Lozano was staring at the money in Bowman's hands. Thinking he was going to shot, pepper sprayed, or stabbed, Bowman got scared, pulled out a gun, closed his eyes, and shot Lozano once. After the shooting, Bowman ran away. Lozano started driving and it looked to Bowman like he was trying to swerve and hit Bowman. Lozano crashed into a building.

The jury received about 50 pages of written jury instructions. The jury was instructed with CALCRIM No. 520 regarding the malice requirements for second degree murder, and with CALCRIM No. 521 informing them they could find Bowman guilty of first degree murder if the murder was willful, deliberate and premeditated, or if the murder was committed during the commission of an attempted second degree robbery. The jury received CALCRIM No. 540A defining felony murder, explaining that they could find Bowman guilty of first degree felony murder if he caused Lozano's death while intending to commit second degree robbery, and CALCRIM No. 1600 defining robbery. The jury received CALCRIM No. 571 on voluntary manslaughter as a lesser included offense if Bowman acted in imperfect self-defense, and CALCRIM 580 on involuntary manslaughter as a lesser included offense if Bowman caused the death of Lozano while intending to commit second degree attempted robbery with criminal negligence.

B. *Jury deliberations*

The jury began deliberations on May 24, 2023, a Wednesday. The jury resumed deliberations on Thursday, and sent two jury notes that day. In the first note, the jury: (1) requested "clarification on second degree murder"; (2) asked if the pill bottle or jar had been recovered; and (3) requested readback

4

of Bowman's testimony regarding a social media post and his interaction with Lozano. The court answered the first question with "Refer to Instruction 520." Later that day, a second jury note requested the "cooked the chicken/still raw" social media post by Bowman. The jury deliberated until 3:37 p.m. that day and then recessed for the holiday weekend.

The jury resumed deliberations at 9:30 a.m. on Tuesday, May 30, 2023. They assembled in the courtroom for a readback from 10:00 to 10:08 a.m. At 10:21 a.m., the trial court was informed of a "potential jury conflict." The trial court ordered the jury to stop deliberating until the court could inquire further.

Before any further proceedings commenced, the foreperson sent out a note which read "We have a hung jury!"

The court convened the parties and explained on the record:

"We had a particular issue with the juror in Seat No. 1 who left the jury room upset and indicated to the bailiff that she was being picked on, that the jurors were not getting along. I believe she was called a derogatory name so we are going to bring that juror in right now and question her."

The court brought in Juror No. 1 and addressed her as follows:

"I understand that there is some discord, that there's some discord going on in the jury room. Can you tell me what is happening with respect to you."

Juror No. 1 answered: "With respect to me, I am doing my best to come to a decision based on the facts that I heard as applied with the law. So for me, it's very important to understand the intricacy of the law. It's new to me. It's not straightforward in [sic] way I think about things. It's important that I clearly understand to make the best possible decision what I feel is most true based on the information I have. I think my other fellow jurors are

frustrated with that." [¶] And today, I think—I don't want to say which juror, but if you need me to—he called me a 'fucking bitch' and that—that made some comments after that—I'm paraphrasing, 'I should have conjugal visits with the perpetrator.' I don't know where it is coming from, and I don't feel like while I try to do my civic duties I need to put up with that kind of abusive interaction."

The court allowed the parties to inquire, but neither counsel chose to ask Juror No. 1 any questions. The court next brought in Juror No. 6, the foreperson, and the following exchange occurred:

"The court: And I understand that there is some discord that is occurring in the jury room. · Could you please tell me a little bit what is happening.

"The foreperson: It's 11 to 1.

"The court: I don't want to know—let me explain. · I don't want to know what the decision is. I want to know what is happening in terms of the discussions related to the verdict. · So No. 1, juror in Seat No. 1 has indicated that there is some language being used and things being said against her related to the deliberation process. · So related only to the deliberation process, can you tell us what's happening?

"The foreperson: There was one person that became frustrated and said something that they shouldn't have said, but that person apologized to all of us as well as to her."

The court then asked the foreperson whether Juror No. 1 was deliberating:

"The court: The juror that's seated in No. 1, still deliberating or is she not deliberating with the group?

"The foreperson: She has been deliberating with the group.

6

"The court:  Have there been efforts to try to engage her in the deliberation process?

"The foreperson:  Yes, several times.

"The court:  Okay. · And has she essentially refused to listen to her fellow jurors? · Or has she engaged in deliberations?

"The foreperson: · She has refused to listen to other points of view and—and then she cuts everybody off.

"The court:  Okay."

This time, defense counsel took up the court's offer to ask questions.

"[Defense attorney]:  Is she just not communicating, or is she just not listening to what the other people are saying?

"The foreperson: · She is not really listening, and she's interpreting in her own—in other words, we are having to pull things out of her to get her to communicate. · She's created kind of an issue when there shouldn't be.

"[Defense attorney]: · Is the issue that she's just not agreeing with everybody else?

"The foreperson: · Yes and no. · It's like she's dragging her feet. · She's just—I don't know personally and I don't know how to take her. · But I've tried to keep everybody, you know, on the task and say let's go over, okay. · And she is like she shuts down and is ignoring us and she only communicates when she feels like it.

"[Defense attorney]: · So are people like asking her things or asking her questions and she's refusing to answer them?

"The foreperson: · We ask her questions and she doesn't always answer the questions. · And then she's bogged down by the paperwork on the law."

The court held an unreported chambers conference, and then summoned Juror No. 4 for inquiry:

7

"The court: · We are trying to resolve some issues relating to discord in the jury room. · Can you tell us a little bit about what's going on with Juror No. 1.

"Juror No. 4: · She's not really communicating with any of us. · She's just looking at the paper, reading and reading. · We'll ask her, her opinion. 'Well, I'm not comfortable.' · That's all she keeps saying. ·We try to explain to her everything that happened on the witness stand here.

"The court: · Why does she say she's not comfortable?

"Juror No. 4: · Not comfortable with the different definitions of—the different definitions between murder 1. · She just doesn't understand it.

"Court: · So when you try to engage or when other jurors try to engage in conversation with her, does she engage and communicate?

"Juror No. 4: · No. · No.

"The court: · All right.

"Juror No. 4: · She goes back to reading.

"The court: She essentially will not communicate with the other jurors?

"Juror No. 4: · No.

"The court: Based on what you've observed, do you believe she's refusing to deliberate with other jurors?

"Juror No. 4: · Yes.

"The court: All right. · And have any of you tried to talk to her about the issues that she's having with the law?

"Juror No. 4: · Yes.

"The court: And how does she respond?

"Juror No. 4: · 'I'm just not comfortable,' and goes back to reading again and turns the page. · And she's presented that packets of notes I don't know how many times, too many times. · The records aren't going to change."

Defense counsel then inquired about "name-calling," and Juror No. 4 responded, "Yes.  He apologized and she accepted his apology."

Finally, the court inquired of Juror No. 11:

"The court:  Without telling us what your verdict is or anything of that nature, can you let us know what's happening with the discord and Juror No. 1 in the jury room.

"Juror No. 11: · I'm not entirely sure. · I was on the other side of the table. · I just know something was said, and it upset her. · There was a little argument with one of the other jurors, and she came out to talk to someone about it.

"The court:  During deliberations, have you found that juror in Seat No. 1 is willing to engage in deliberations and communicate with her fellow jurors?

"Juror No. 11: · Not necessarily. · She keeps going over all of the papers that we are given and she keeps saying that she doesn't agree with a lot of what everyone else is saying but she won't give reason as to why she disagrees.

"The court:  All right. · And what happens when somebody that's on the jury tries to ask her about why she disagreed.

"Juror No. 11: · She just says she needs more time to look at the papers. · Go over again.

"The court:  So, essentially, what we have heard is that she—strike that.  So do you believe that she's willing to engage in conversation with other jurors and hear their points of view?

"Juror No. 11: · No."

The court did not hear from any other jurors or speak with Juror No. 1 again.  The court stated the following:  "All right. · The court has heard from

9

three separate jurors, including the foreperson, that indicates the juror in Seat No. 1 is not willing to deliberate with her fellow jurors. · It appears having discussions with all the other jurors, the theme is that juror in Seat No. 1 will not engage in communication and will not deliberate with her fellow jurors and discuss her points of view. · It appears that she may have a different point of view, but will not explain to her—the fellow jurors why she has that point of view or what exactly she's looking at or why she feels that way. · It appears to the court that she is not willing to deliberate and communicate."

Defense counsel argued for a different interpretation, stating, "It just seems like she's disagreeing with the rest of the jurors and I heard one of the jurors talked about we tried explaining to her something and she keeps going back to the jury instructions and they seem to be upset about that. · We want the jurors to follow law. · I think it might be a disagreement of her understanding of what the jury instructions say and what they believe the jury instruction says, but I'm not entirely sure what is going on."

The court responded: "I would normally agree with you if that was the case. · The difference the court sees happening is we have several different jurors of very different personalities come out and say that she's bogged down by the paperwork. · She just wants to look at the paperwork. · She doesn't agree with why the others feel that way, but, yes, she won't communicate with them and deliberate with them and explain why she feels that way. That's if the reason is finding that she's refusing to deliberate. [¶] She was also characterized as refusing to listen to other points of view and cuts them off. · She is ignoring communication from other—and won't—effectively won't deliberate with her fellow jurors. [¶] ·So based on those separate jurors indicating she's not comfortable with the law, she continues to engage solely

10

in the paperwork in front of her but not with the deliberative process, the court is going to find that she is not deliberating with her fellow jurors, and we are going to replace her with an alternate."

An alternate juror was called and the newly-constituted jury began deliberating at 11:38 a.m. that day. The jury recessed for lunch at 12:10 p.m. and resumed deliberations at 1:27 p.m. At 1:37 p.m., after a total of 42 minutes spent deliberating, the jury informed the court that it had reached a verdict. After resolving some confusion over the special allegation and the verdict forms, the jury returned its verdict at 2:04 p.m. The jury found Bowman not guilty of first degree murder, guilty of second degree murder, and found true the three firearm allegations.

## DISCUSSION

### A. *Legal Principles*

"If at any time, whether before or after the final submission of the case to the jury, a juror dies or becomes ill, or upon other good cause shown to the court is found to be unable to perform his or her duty, or if a juror requests a discharge and good cause appears therefor, the court may order the juror to be discharged . . . ." (§ 1089.) In most circumstances, section 1089 is applied to remove a juror "who becomes physically or emotionally unable to continue to serve as a juror due to illness or other circumstances." (*People v. Cleveland* (2001) 25 Cal.4th 466, 474 (*Cleveland*).) However, section 1089 also has been applied "to permit the removal of a juror who refuses to deliberate, on the theory that such a juror is 'unable to perform his duty.'" (*Cleveland*, at p. 475.)

"[T]he removal of a seated juror for failing to deliberate is a serious matter that implicates a defendant's state and federal constitutional right to a unanimous decision by the jury." (*People v. Armstrong* (2016) 1 Cal.5th 432

11

(*Armstrong*).)  Accordingly, "[g]reat caution is required when deciding to excuse a sitting juror."  (*People v. Allen and Johnson* (2011) 53 Cal.4th 60, 71 (*Allen*).)  "The requirement of a unanimous criminal verdict is an important safeguard, long recognized in American jurisprudence.  This safeguard rests on the premise that each individual juror must exercise his or her own judgment in evaluating the case.  The fact that other jurors may disagree with a panel member's conclusions, or find disagreement frustrating, does not necessarily establish misconduct."  (*Ibid.*)

If a juror's willingness or ability to continue deliberating is unclear, the trial court must take care that its investigation is neither "too cursory" nor intrudes "too deeply into the jury's deliberative process to avoid invading the sanctity of the deliberations or creating a coercive effect on those deliberations."  (*People v. Fuiava* (2012) 53 Cal.4th 622, 710 (*Fuiava*).)  "The inquiry must be sufficient to determine the facts that demonstrate a juror's ability or inability to deliberate . . . and may not assume the worst about a juror without giving her an opportunity to explain herself."  (*People v. Jones* (2020) 50 Cal.App.5th 694, 700-701 (*Jones*).)

During the inquiry, the court should focus on determining whether the jurors' testimony supports the conclusion that a juror is refusing to deliberate.  "A refusal to deliberate consists of a juror's unwillingness to engage in the deliberative process; that is, he or she will not participate in discussions with fellow jurors by listening to their views and by expressing his or her own views."  (*Cleveland, supra*, 25 Cal.4th at p. 485.)  But "[t]he circumstance that a juror does not deliberate well or relies upon faulty logic or analysis does not constitute a refusal to deliberate and is not a ground for discharge.  Similarly, the circumstance that a juror disagrees with the majority of the jury as to what the evidence shows, or how the law should be

12

applied to the facts, or the manner in which deliberations should be conducted does not constitute a refusal to deliberate and is not a ground for discharge." (*Ibid.*)

When reviewing the dismissal of a juror, the California Supreme Court has adopted a heightened standard of review that protects the defendant's fundamental rights to due process and a fair trial. (*Armstrong*, *supra*, 1 Cal.5th at p. 450; Cal. Const., art. I, § 16 [trial by jury is an "inviolate right"].) The juror's inability to perform his or her duty must appear in the record as a "demonstrable reality." (*Armstrong, supra,* 1 Cal.5th at p. 450.) This test is "more comprehensive and less deferential" than the substantial evidence test. (*Id.* at p. 451.) Under both tests, the appellate court reviews the entire record and does not reweigh the evidence. (*Id.* at pp. 450-451.) However, under the substantial evidence test, the court reviews the record in the light most favorable to the judgment and upholds it if there is credible evidence that *could* reasonably support the trial court's decision to remove a juror. (*Id.* at p. 450.) Under the demonstrable reality test, by contrast, we must determine whether the trial court actually *did* rely on evidence that supports removing the juror. (*Id.* at p. 451.) This "heightened" and "more stringent" demonstrable reality standard "more fully reflects an appellate court's obligation to protect a defendant's fundamental rights to due process and to a fair trial by an unbiased jury." (*People v. Barnwell* (2007) 41 Cal.4th 1038, 1052 (*Barnwell*).)

An abuse of discretion in discharging a juror under section 1089 "requires reversal only if it is reasonably probable that a result more favorable to the defendant would have been reached but for the error." (*People v. Bowers* (2001) 87 Cal.App.4th 722, 736 (*Bowers*) [applying the standard of *People v. Watson* (1956) 46 Cal.2d 818, 836]; *People v. Henderson*

(2022) 78 Cal.App.5th 530, 565 9 (*Henderson*) [discussing prejudice requirement].)

Under the "more comprehensive and less deferential review" applicable here, we consider the reasons that the trial court provided, identify the evidence on which the court actually relied, and determine whether the evidence "manifestly supports" the court's conclusion that a juror is refusing to deliberate. (*Barnwell, supra*, 41 Cal.4th at p. 1053.)

B. *Analysis*[2]

The trial court identified two reasons for its removal of Juror No. 1: (1) she was unwilling to deliberate and communicate with fellow jurors, and (2) she was "bogged down by the paperwork." Applying the heightened and more stringent standard of review, we conclude that the court abused its discretion in discharging Juror No. 1 because we are not confident the record "manifestly supports" as a "demonstrable reality" the court's conclusion that Juror No. 1 was unable to perform her duty as a juror. (*Barnwell, supra*, 41 Cal.4th at p. 1053.)

In reaching its first conclusion, that Juror No. 1 was not willing to deliberate with fellow jurors, the court specifically noted that Juror No. 1 "may have a different point of view" but would not explain "why she has that

---

[2]    The Attorney General contends that Bowman forfeited his claim that the trial court should have conducted a more searching inquiry during the *Cleveland* hearing. Defense counsel below did not object to the scope of the hearing, and thus we agree that this issue is forfeited. The Attorney General does not contest that defense counsel's comments after the trial court removed the juror are sufficient to have preserved on appeal his challenge to the removal of Juror No. 1. Since we reverse on this issue, we need not resolve Bowman's challenges to the scope of the *Cleveland* hearing, whether his claim was forfeited, or whether, if forfeited, his counsel was ineffective for having failed to object.

point of view," "what exactly she's looking at," or "why she feels that way." This finding is not supported by the evidence the court actually relied upon. Juror No. 6, the foreperson, said Juror No. 1 had been deliberating, although the jury had to "pull things out of her to get her to communicate," she was "dragging her feet," communicated "only when she feels like it," and "doesn't always answer the questions." Juror No. 4 said Juror No. 1 was "not really" communicating with the jurors, but said Juror No. 1 had explained she was not comfortable with the different definitions of first degree murder, which she did not understand. Juror No. 1 "keeps on saying that she doesn't agree with a lot of what everyone else is saying," according to Juror No. 11, and would not "give [a] reason as to why she disagrees," but then supplied Juror No. 1's explanation: that she "needed more time to go over the paperwork." Thus, the evidence relied upon—the statements of Juror Nos. 6, 4, and 11— established that Juror No. 1 disagreed with the other jurors, was not comfortable with the definitions of first degree murder, was looking at the law, and wanted more time to go over the paperwork. Juror No. 1 said much the same thing. In contrast to the court's view, these answers show Juror No. 1 explained, however inartfully, that she disagreed with the others, "why she has that point of view," "what exactly she's looking at," and "why she feels that way." "It is not always easy for a juror to articulate the exact basis for disagreement after a complicated trial, nor is it necessary that a juror do so. As we have stated, it is not required that jurors deliberate well or skillfully." (*People v. Engelman* (2002) 28 Cal.4th 436, 446 (*Engelman*).)

The court's finding that "three separate jurors, including the foreperson," indicated that Juror No. 1 "is not willing to deliberate," is not supported by the evidence the court actually relied upon. While Juror No. 4 offered the ultimate opinion that Juror No. 1 refused to deliberate, Juror 6

15

said she was deliberating, and Juror No. 11 equivocated, answering "Not necessarily" when asked if Juror No. 1 was willing to engage in deliberations.

But "a trial court should be wary of relying on the *opinions* of jurors, rather than on its own consideration of objective facts." (*Allen, supra*, 53 Cal.4th at p. 75.) Instead of reaching a conclusion premised on the other jurors' opinions, the court "should focus on its own consideration of a juror's *conduct*." (*Ibid.*) "It is difficult enough for a trial court to determine whether a juror actually is refusing to deliberate or instead simply disagrees with the majority view. [Citations.] Drawing this distinction may be even more difficult for jurors who, confident of their own good faith and understanding of the evidence and the court's instructions on the law, mistakenly may believe that those individuals who steadfastly disagree with them are refusing to deliberate or are intentionally disregarding the law." (*Engelman, supra,* 28 Cal.4th at 446.)

Looking at the conduct, not at the jurors' characterizations or opinions, the questioned jurors all described communications with Juror No. 1, contradicting the assertion that Juror No. 1 refused to communicate. Juror No. 6 said while the jury had to "pull things out of her to get her to communicate," and she was "dragging her feet," she communicated, though "only when she feels like it," and "doesn't always answer the questions." Juror 4 said Juror No 1 was "not really" communicating with the jurors, but said Juror No 1 had explained she was not comfortable with the different definitions of first degree murder, which she did not understand. Juror No. 11 relayed Juror No. 1 saying she "needed more time to go over the paperwork." For these jurors to have been able to articulate Juror No. 1's concern about the definition of murder and her need for more time, Juror No 1 must have been engaging in the deliberative process, at least somewhat.

16

(*See People v. McGhee* (2025) 17 Cal.5th 612, 634 [a juror's ability to describe to the court the views of the challenged juror showed there was some discussion going on] (*McGhee*).)

The court cited as its second basis for removing Juror No. 1 that Juror No. 1 was "bogged down" by the paperwork. Juror No. 1 explained she wanted to understand the "intricacy of the law," and acknowledged that this frustrated her fellow jurors. The other jurors also noted Juror No 1's focus on the law. Juror 6 characterized Juror No 1 as being "bogged down by the paperwork on the law." Juror No. 4 stated that instead of engaging with the other jurors Juror No. 1 "goes back to reading again and turns the page. And she's presented that packets of notes I don't know how many times, too many times. The records aren't going to change." Juror No 11 said Juror No. 1 "keeps going over all of the papers that we are given," and "she just says she needs more time to look at the papers."

Thus, while the statements of all jurors, including Juror No. 1, agreed that Juror No. 1 was focused on the law, the evidence does not manifestly support the court's conclusion that Juror No. 1's focus on the law constituted a refusal to deliberate. Juror No. 4 complained that Juror No. 1 focused on the notes "too many times" but, in Juror No. 4's view, "the records aren't going to change." Juror No. 6 said Juror No. 1 "is not really listening," is "interpreting in her own words," and "created . . . an issue when there shouldn't be."

How many times a juror should examine the instructions or records, how a juror should interpret things, and whether something should or should not be an issue, are within a juror's purview to determine, bounded by the evidence and the court's instructions, as Juror No. 1 expressly said she was trying to do in coming to a decision. A juror's disagreement with the majority

17

on "the manner in which deliberations should be conducted"—such as how long a juror should take to understand the law before making a decision—"does not constitute a refusal to deliberate and is not a ground for discharge." (*Cleveland, supra,* 25 Cal.4th at p. 485.)  In similar fashion, a juror who disagrees with the majority's view on "how the law should be applied to the facts," as Juror No. 1 told the court she was trying to decide, does not justify removal of the juror. (*Ibid*.)

Further, the first question on the jury's first note requested clarification on second degree murder, which the court answered by directing the jury back to the jury instructions.  Whether other jurors were also confused on the law of second degree murder, or Juror No. 1 articulated her confusion sufficiently to prompt the other jurors to seek the court's assistance, the jury note confirms that deliberation was going on and that the law was a sticking point.  In any case, to resolve the confusion, the court directed jurors to do exactly what Juror No. 1 was doing—refer to the jury instructions.

Our discussion so far reveals that the court did not need to resolve any credibility disputes, to which we would ordinarily defer, because all the jurors, including Juror No. 1, agreed that Juror No. 1 was focusing on the law and that it caused frustration.  The court also did not weigh credibility between the other jurors and Juror No. 1 on the question of whether Juror No. 1 refused to deliberate, because Juror No. 1 was not asked this question and made no statement contradicting the others, and the other jurors did not uniformly opine that Juror No. 1 refused to deliberate.  (Cf. *Barnwell, supra,* 41 Cal.4th at p. 1053 [discharge of juror upheld where trial court credited the nine jurors who said the challenged juror expressed or exhibited a bias against police officers, though the challenged juror said he was not biased].)

CALCRIM required each juror "to decide the case for yourself," after having discussed the case with the other jurors. Such discussion, the evidence shows, had been occurring, though imperfectly and not without frustration—as demonstrated by the name-calling that prompted Juror No. 1 to alert the court in the first place. (*See Engelman, supra*, 28 Cal.4th at p. 446 [" '[J]urors can be expected to disagree, even vehemently, and to attempt to persuade disagreeing fellow jurors by strenuous and sometimes heated means.' "].) If what Juror No. 1 needed to make a decision, as she told Juror No. 11, was more time, then it is no surprise she eventually stopped answering the other jurors' persistent inquiries and resisted their efforts to convince her as to their interpretation of the law. (*People v. Barton* (2020) 56 Cal.App.5th 496, 515 (*Barton*) [juror's refusal to change her mind and her decision to no longer attempt to explain that decision to the other jurors did not amount to misconduct.].)

We find guidance in other cases that have described the type of juror conduct that does not warrant removal. In *Cleveland,* the jurors complained that the juror at issue discussed matters that the other jurors considered " 'irrelevant,' " took an " 'unreasonable interpretation' " that differed from the interpretation of the rest of the jury, and contradicted what the other jurors said without answering their questions. (*Cleveland*, 25 Cal.4th at pp. 471-472, 486.) The *Cleveland* court concluded that the trial court erred in discharging the juror because the jurors' comments showed "the juror simply viewed the evidence differently from the way the rest of the jury viewed it." (*Id*. at p. 486.) Although the juror's "approach to deliberations apparently frustrated his colleagues," it could not be said he refused to deliberate. (*Ibid.*) Here, the comments reflect that Juror No. 1 viewed the law differently from the way the rest of the jury viewed it, and some jurors were frustrated by

19

Juror No. 1's approach. But our Supreme Court has held that grounds to discharge a juror do not exist because the juror does not "deliberate well or skillfully," (*Engelman*, at p. 446), or, as in this case, swiftly.

In *McGhee, supra*, 17 Cal.5th 612, the jurors said the discharged juror had been deliberating for three days and shared reasons for his views, but he did not make sense and was irrational and the jurors were frustrated with his views on the evidence. (*Id*. at pp. 633-635.) Some of the jurors said the deliberation was going well and that they perceived no bias from the discharged juror. (*Id*. at p. 624.) Our Supreme Court found that the jurors' opinions regarding the discharged juror merely showed that they disagreed with his views, and the trial court's reliance on those accusations was not well-founded in discharging the juror. (*Id*. at pp. 635, 637.)

In *Barton*, jurors complained that the discharged juror would not talk openly and freely but would share her opinions, appeared to be considering other opinions but would not provide reasons for her own opinions, would answer questions unsatisfactorily or repeat the answer over and over again, referenced her notes and other evidence, and was not acting reasonably. (*Barton, supra*, 56 Cal.App.5th at pp. 504-507.) A panel of this court concluded the record revealed that the jurors merely disagreed with the discharged juror's ultimate opinion regarding the evidence. Their opinion as to the discharged juror's purported lack of deliberation was accordingly insufficient to support the trial court's finding by a demonstrable reality. (*Id*. at pp. 512-513.)

While courts most often encounter disagreement between the discharged juror and the rest of the jury as to the evidence, we find no reason to treat the circumstances here any differently, where the jurors and Juror No. 1 apparently disagreed as to the correct understanding of the law or how

long it should take for a juror to arrive at a correct understanding of the law. Whatever the nature or content of the disagreement, these cases stand for the proposition that disagreement among jurors does not constitute failure to deliberate and justify discharge.

In contrast, in *People v. Diaz* (2002) 95 Cal.App.4th 695, 705, in which the removal of a juror was upheld, the discharged juror was not merely disagreeing with the other jurors. The trial court found that the juror was upset by a relative's illness or by intimidation by the other jurors, and this emotional state inhibited the juror's ability to deliberate. Based on its observation of the discharged juror's demeanor, the court assessed that the juror had not been candid with the court about these effects on her ability to deliberate. In *People v. Lomax* (2010) 49 Cal.4th 530, 591, the discharged juror had prejudged the case but refused to share any of his reasoning with the other jurors, and the juror himself had said he was not able to consider the evidence or take part in the deliberations because of his conscientious objection to the death penalty. In *People v. Samuels* (2005) 36 Cal.4th 96, 131–133, discharge of a juror was upheld where the juror was distressed, asked to be removed, and told the court she could not follow her oath and lacked courage to impose the death penalty even if she were convinced the case required it.

Juror No. 1 never indicated that she was unable or unwilling to continue deliberating, or expressed a bias, moral conviction, or external distraction that would preclude her from deliberating on Bowman's case. She never conveyed a wish to be excused. None of the other jurors alerted the court that Juror No. 1 refused to deliberate or asked her to be excused. The circumstances here are thus unusual among cases involving removal of a juror, which typically arise out of a complaint—sometimes strenuous

21

complaints—from one or more jurors. (*See Armstrong*, *supra,* 1 Cal5th at pp. 445-446 [two jurors separately sent out notes complaining about each other and foreperson sent a note on behalf of a majority of the jurors complaining about one of those two jurors]; *Cleveland, supra,* 25 Cal.4th at p. 470 [the jury sent out a note that began, "We request an alternate to replace one juror . . . ."]; *Allen, supra,* 53 Cal.4th at p. 66 [two jurors reported a concern that one juror had prejudged the case]; *McGhee, supra,* 17 Cal.5th at p. 622 [jurors sent out a note complaining about a juror]; *Barton*, *supra*, 56 Cal.App.5th at p. 503 [jury sent out a note asking: "Is it possible to proceed with an alternate juror if we suspect that a single juror is trying to nullify the rest of the jurors?"].)

In contrast, here, Juror No. 1 herself emerged to alert the court that another juror called her a vulgar name and made inappropriate comments referencing sexual relations between her and the defendant.[3] But Juror No. 1 did not claim that this dynamic caused her to want to withdraw from deliberating. She instead said she was trying to do her civic duty and believed that she should not be attacked in doing so. (*Jones, supra*, 50 Cal.App.5th at p. 701 [record did not support discharge of juror who never said she was unwilling or unable to deliberate]; *People v. Delamora* (1996) 48 Cal.App.4th 1850, 1855-1856 [record did not support discharge of jurors who, among other factors, never requested discharge or said they could not continue].)

---

[3] The record does not contain any indication that the juror who made the vulgar comments to Juror No. 1 was ever admonished for doing so or reminded of the instruction that the jurors must treat each other courteously. (CALCRIM No. 3550.) There is no indication the trial court ever reassured Juror No. 1 that such language was inappropriate and unsanctioned by the court. Rather, the name-calling juror remained.

The evidence is clear that, at the time of the *Cleveland* hearing, there was a split in the jury.  By this time, Juror No. 1 had listened to multiple days of trial evidence, sat through closing arguments by both parties, heard the court's instructions, and been deliberating with the jury for over two days.  The jury had sent out two jury notes, one containing three requested items of evidence, and received read-back of multiple pieces of testimony.  Whether the remaining jurors declined to wait until Juror No. 1 developed sufficient expertise on the law or believed they could not convince Juror No. 1 that their interpretation of the law was correct, the jury took a vote, arrived at 11-1, and the foreperson sent out a note saying this was a hung jury.

We reject the Attorney General's attempt to discount the 11-1 vote as merely reflecting Juror No. 1's inability "to commit to a position that the other 11 jurors took, rather than taking a position of her own."  While a jury is instructed to try to achieve a unanimous verdict, "the possibility of a hung jury is an inevitable by-product of our unanimous verdict requirement." (*People v. Barraza* (1979) 23 Cal.3d 675, 683.)

"It cannot be said a juror has refused to deliberate so long as a juror is willing and able to listen to the evidence presented in court, to consider the evidence and the judge's instructions, and to finally come to a conclusion and vote." (*Barton*, 56 Cal.App.5th at p. 514.)  This is precisely what Juror No. 1 did.  Applying the heightened standard of review that governs our assessment of a trial court's decision to discharge a juror, and based on our examination of the record as a whole, we conclude that the court abused its discretion in discharging Juror No. 1 because her inability to perform her duty as a juror does not appear in the record as a demonstrable reality.

The trial court's error in discharging Juror No. 1 warrants reversal. (*Armstrong*, *supra*, 1 Cal.5th at p. 454.)  She was likely the lone holdout, and

had the court accepted the foreperson's report of a hung jury, the trial may have ended in a mistrial.  Instead, Bowman was convicted after less than an hour of deliberations following the court's empanelment of an alternate juror. (Compare *Bowers, supra,* 87 Cal.App.4th at p. 736 [record "strongly" suggested discharged juror was the lone holdout, and after less than one day of deliberation the new jury returned verdicts of guilty] and *Barton, supra*, 56 Cal.App.5th at p. 516 [defendant was convicted within hours after lone holdout juror was erroneously discharged and the alternate juror joined the jury] with *Henderson, supra*, 78 Cal.App.5th at p. 566 [error in removing juror was not prejudicial where juror was discharged before deliberations and there was no indication he was leaning one way or the other on the question of the defendant's guilt].)

On the facts set forth above, there is no double jeopardy bar to retrial of the case.  (*People v. Hernandez* (2003) 30 Cal.4th 454 1, 9.)

## DISPOSITION

The judgment is reversed.

O'ROURKE, Acting P. J.

WE CONCUR:

DO, J.

KELETY, J.